## Smith *v.* Crumlish, Appellant.

Argued June 14, 1965. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, FLOOD, JACOBS, and HOFFMAN, JJ.

*David L. Creskoff,* Assistant District Attorney, with him *Stanley M. Shingles* and *Joseph M. Smith,* Assistant District Attorneys, *F. Emmett Fitzpatrick, Jr.,* First Assistant District Attorney, and *James C. Crumlish, Jr.,* District Attorney, in propria persona, for appellant.

*Jacob Kalish,* with him *Harold Kohn,* and *Dilworth, Paxson, Kalish, Kohn & Dilks,* for appellee.

*Maurice Pollon,* for appellee.

*Jacob S. Richman,* for American Civil Liberties Union under Rule 46.

OPINION BY HOFFMAN, J., April 14, 1966:

This appeal raises important constitutional questions concerning the seizure of allegedly obscene motion picture films and the prosecution of exhibitors under certain sections of The Penal Code.

On November 23, 1964, in response to citizens' complaints, a member of the District Attorney's staff and a county detective viewed "Olga's House of Shame," a film which was being shown at the Devon Theater and the Art Spruce Theater. The following day the detective applied to a Philadelphia magistrate for a search and seizure warrant, alleging that the motion picture was obscene and in violation of §528[1] and §529[2] of the Pennsylvania Penal Code. The magistrate found probable cause to believe that the film was obscene and issued the warrant. Later that day the managers of both theaters were arrested and the films were seized. A preliminary hearing was scheduled for November 25, 1964, but was continued at the request of the defense attorneys to enable them to view the motion picture. At a preliminary hearing on January 21, 1965, the magistrate held the defendants for action by the Grand Jury which subsequently indicted them on January 28, 1965. On February 8, 1965, defendants filed motions to quash the indictments and to suppress the evidence in the Court of Quarter Sessions of Philadelphia County. On March 19, 1965, the court below quashed the indictments holding that §§528 and 529 are unconstitutional.

---

[1] Act of June 24, 1939, P. L. 872, §528, amended, September 23, 1959, P. L. 945, §1, 18 P.S. §4528.

[2] Act of June 24, 1939, P. L. 872, §529, 18 P.S. §4529.

Freedom of speech by means of motion pictures is protected by the First and Fourteenth Amendments to the Federal Constitution. While motion pictures may not necessarily be subject to the precise rules applicable to other modes of expression, the basic principles of free speech, as enunciated by the United States Supreme Court, make freedom of expression the rule, and limits on that freedom the exception. One recognized exception is that obscenity is not within the area of protected speech. *Roth v. United States,* 354 U.S. 476 (1957).

The principal question presented here is not whether the Commonwealth has the power to deal with obscenity, but whether the statutory language employed in the penal code is so broad or so vague as to inhibit legitimate expression. It is well established that a statute which is vague or overbroad is unconstitutional insofar as it may operate in the area of First Amendment freedoms. "The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." *National Association for the Advancement of Colored People v. Button,* 371 U.S. 415, 432-3 (1963).[3]

---

[3] "It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion. . . . A like threat is inherent in a penal statute, like that in question here, which does not aim specifically at evils within the allowable area of state control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press. The existence of such a statute, which readily lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure, results in a continuous and pervasive restraint

In *Jacobellis v. Ohio,* 378 U.S. 184 (1964), and in *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General,* 34 U. S. Law Week 4236 (March 21, 1966), the Court reaffirmed the test for obscenity enunciated in *Roth v. United States,* supra: "[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest."

Section 528 of The Penal Code provides: "An exhibition shall be deemed obscene if, to the average person applying contemporary community standards, its dominant theme taken as a whole appeals to prurient interest." It is evident that this definition of obscenity conforms with the standard set forth in *Roth, Jacobellis* and *Memoirs,*[4] and that the Court below erred in holding §528 to be unconstitutionally vague.

Section 529 of The Penal Code provides: "Whoever advertises by circulars or posters any indecent, lewd or immoral show, play or representation, is guilty of a misdemeanor, and on conviction thereof, shall be sentenced to pay a fine not exceeding three hundred dol-

---

on all freedom of discussion that might reasonably be regarded as within its purview. It is not any less effective or, if the restraint is not permissible, less pernicious than the restraint on freedom of discussion imposed by the threat of censorship. . . . Where regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the statute, and not the accusation or the evidence under it, which prescribe the limits of permissible conduct and warns against transgression." *Thornhill v. Alabama,* 310 U.S. 88, 97-8 (1940).

[4] We must emphasize that the court in *Memoirs* also held that, "Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." p. 4237.

lars ($300), or undergo imprisonment for a period not exceeding six months, or both." In *Commonwealth v. Blumenstein,* 396 Pa. 417, 153 A. 2d 227 (1959), the Court held unconstitutionally vague a statute which made it illegal to exhibit "any . . . moving pictures of a lascivious, sacreligious, obsence, indecent or immoral nature and character, or such as might tend to corrupt morals. . . ." The terms "indecent" and "immoral" were specifically ruled upon and rejected in the *Blumenstein* case. Obviously, therefore, §529 is vague and overbroad under the principles set forth in *Blumenstein* and in light of the standard enunciated in *Roth, Jacobellis* and *Memoirs.*

The court below also concluded that the procedure used in seizing the film is unconstitutional. In *Marcus v. Search Warrant,* 367 U.S. 717, 731 (1961), the Supreme Court held that ". . . under the Fourteenth Amendment, a State is not free to adopt whatever procedures it pleases for dealing with obscenity . . . without regard to the possible consequences for constitutionally protected speech." In addition the Court rejected the proposition that obscene material is subject to search and seizure in the same fashion as gambling paraphernalia or other contraband. In reviewing the historical background of the Bill of Rights the Court said: "The use by government of the power of search and seizure as an adjunct to a system for the suppression of objectionable publications is not new. Historically the struggle for freedom of speech and press in England was bound up with the issue of the scope of the search and seizure power." p. 724. . . . "The Bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression." p. 729.

In *Quantity of Books v. Kansas,* 378 U.S. 205 (1964), a statute authorized the seizure of allegedly

obscene books before an adversary determination of their obscenity. The Attorney General of Kansas obtained a court order directing a sheriff to seize certain paperback novels at a specific place of business. The Court concluded that the procedures employed were constitutionally insufficient, holding that seizure of books prior to an adversary determination of their obscenity presents the danger of abridgement of the right of the public in a free society to unrestricted circulation of nonobscene books.

The Commonwealth contends, however, that the rule established with respect to seizure of books does not apply to seizure of motion picture films. This contention ignores the specific citation and application of the doctrines of *Marcus* and *Quantity of Books* in *Freedman v. Maryland*, 380 U.S. 51 (1965), which involved motion picture censorship.[5] In *Freedman* the Court reaffirmed the principle that only a judicial decision in an adversary proceeding ensures the necessary sensitivity to freedom of expression, p. 58. The court also held that any restraint imposed in advance of a final judicial determination on the merits must be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution, and that the procedure must insure a prompt, final judicial decision to minimize the deterrent effect of an interim and possible erroneous denial of a license.

Although the *Freedman* case involved censorship, the circumstances of the seizure in the present case suggest compelling reasons in support of the application of the principles employed in *Freedman* to the present case. As the court below noted: "The film un-

---

[5] Significantly, too, in *Freedman*, the Court, for the purpose of illustrating an acceptable censorship scheme for movies, cited *Kingsley Books, Inc. v. Brown*, 354 U.S. 436 (1957), which involved injunctive restraint on the sale of books already in circulation. p. 60.

der consideration has already been out of the theaters several months and its absence will continue through many more months of tedious litigation before the question of obscenity will be decided in an adversary hearing."

It is important, too, that the Supreme Court expressed concern in *Freedman* that delays in the exhibition of motion pictures resulting from inadequate procedural safeguards would have a discouraging effect on the exhibitors.[6] In discussing what might be a valid censorship scheme the court indicated that the exhibitor should be allowed ". . . to submit his film early enough to ensure an orderly final disposition of the case before the scheduled exhibition date—far enough in advance so that the exhibitor could safely advertise the opening on a normal basis. Failing such a scheme or sufficiently early submission under such a scheme, the statute would have to require adjudication considerably more prompt than has been the case under the Maryland statute. Otherwise, litigation might be unduly expensive and protracted, or the victorious exhibitor might find the most propitious opportunity for exhibition past." In our view the seizure of a film without a procedure which ensures a prompt judicial determination would prove even more inhibiting than a censorship scheme. The seizure might occur after the exhibitor incurred expenses in advertising the opening of a motion picture, and at a time when public interest in the film is greatest. In the face of potentially adverse economic

---

[6] "Particularly in the case of motion pictures, it may take very little to deter exhibition in a given locality. The exhibitor's stake in any one picture may be insufficient to warrant a protracted and onerous course of litigation. The distributor, on the other hand, may be equally unwilling to accept the burdens and delays of litigation in a particular area when, without such difficulties, he can freely exhibit his film in most of the rest of the country; for we are told that only four States and a handful of municipalities have active censorship laws." p. 59.

consequences an exhibitor would shrink from advertising or attempting to show a controversial film.

In the absence of statutory provisions assuring a prompt adversary proceeding and adjudication on the merits, we must conclude that the seizure of the film "Olga's House of Shame" is unconstitutional.

While we recognize the vital social interest in combatting obscenity, such an interest cannot be promoted by statutes which stifle legitimate constitutionally-protected speech. It is of course the task of the legislature to establish a proper statutory scheme. The United States Supreme Court in its reference to the Model Penal Code in *Jacobellis*,[7] and to the procedures for safeguarding constitutionally protected matter in *Kingsley Books, Inc. v. Brown,* 354 U.S. 436 (1957) has laid down some guidelines for the legislature to follow. Fine distinctions must be drawn and serious difficulties in draftsmanship must be overcome.

In conclusion we must note that the court below held that §§528 and 529 are faulty in that they impose liability on an offender regardless of whether he had previous knowledge that he was dealing in illicit materials. In *Mishkin v. New York,* 34 U. S. Law Week 4250, 4253 (March 21, 1966), the Supreme Court held: "The Constitution requires proof of scienter to avoid the hazard of self-censorship of constitutionally protected material and to compensate for the ambiguities inherent in the definition of obscenity." In light of the decisions of the Supreme Court in *Smith v. California,* 361 U.S. 147 (1959), and in *Mishkin,* we would recommend that the legislature leave no doubt in any

---

[7] In view of the explicit approval by the U. S. Supreme Court of the Model Penal Code, revision of §§528 and 529 to conform with the language of the Code may be advisable. See *Jacobellis v. Ohio,* supra, pp. 191-2; *Mishkin v. New York,* 34 U. S. Law Week 4250, 4253, n. 9 (March 21, 1966) ; *Ginzburg v. United States,* 4255, 4258, n. 14 (March 21, 1966).

statute which may be enacted as to what mental elements are necessary to establish a mens rea for prosecution. It is also for the legislature to determine what distinctions, if any, should exist between motion pictures and books in this regard.

Order affirmed.

DISSENTING OPINION BY JACOBS, J.:

I dissent from the majority's conclusion that the film was unconstitutionally seized. In my opinion, neither *Quantity of Books v. Kansas,* which involved the mass seizure of all the available copies of *books* when one copy was sufficient for evidentiary purposes; nor *Marcus v. Search Warrant,* which involved search warrants for *magazines* which warrants were defective because they provided no guide to the seizing officers as to what was "obscene"; nor *Freedman v. Maryland,* which involved an elaborate prior *censorship* scheme for motion pictures, compels that conclusion.

The United States Supreme Court noted the distinction between the type of case now before this Court and the Maryland censorship scheme when it said at p. 57 of *Freedman*: "The administration of a censorship system for motion pictures presents peculiar dangers to constitutionally protected speech. Unlike a prosecution for obscenity, a censorship proceeding puts the initial burden on the exhibitor or distributor." In *Freedman* the Court held at p. 58, "that a *noncriminal* process which requires the *prior* submission of a film to a censor avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." (Emphasis added.) The taking of one film to use as evidence in a criminal prosecution after it has been shown to the public is neither the prior censorship nor the "final restraint" on which the *Freedman* case rested.[1] I fear that the ma-

---

[1] The Court said, at p. 58, "only a procedure requiring a judicial determination suffices to impose a valid final restraint."

jority in its reliance on language from a censorship case will make it impossible for law enforcement officials to prosecute obscenity in motion pictures after the viewing public complains about it. Therefore, I must dissent.

ERVIN, P. J., joins in this dissent.