**CAMBIST FILMS, INC., a Corporation, Plaintiff,**

v.

**Robert W. DUGGAN, District Attorney for Allegheny County, Commonwealth of Pennsylvania, Edward G. Crone, Chief of Detectives, Allegheny County, Commonwealth of Pennsylvania, Joseph M. Loughran, District Attorney of Westmoreland County, Commonwealth of Pennsylvania and Edward Gordon, Chief of Detectives for Westmoreland County, Pennsylvania, Defendants.**

Civ. A. No. 69–300.

United States District Court
W. D. Pennsylvania.

April 28, 1969.

David F. Alpern, Pittsburgh, Pa., for plaintiff.

Henry A. Martin, Monessen, Pa., for defendants Joseph M. Loughran and Edward Gordon.

Gerald C. Paris, and Louis C. Abromson, Pittsburgh, Pa., for Robert W. Duggan and Edward G. Crone.

## OPINION

DUMBAULD, District Judge.

Plaintiff holds United States and Canadian rights for distribution of an Argentine motion picture film entitled "The Female", of which it owns 70 prints. In general 25 or more are in simultaneous use, but about once a year all 70 would be needed. This action is brought under the "Ku Klux Act" of April 20, 1871, 17 Stat. 13, 42 U.S.C. § 1983,[1] to recover five prints seized without a warrant of any kind by law enforcement authorities in Allegheny County and Westmoreland County.[2] Plaintiff invokes the First, Fourth, and Fourteenth Amendments of the Constitution. It is alleged that plaintiff has been deprived of the use of its property, and also that the acts of the defendants diminish bookings of the film both locally and elsewhere. Plaintiff's president testified that additional prints could be made without great difficulty or expense, and that the principal grievance felt was the impact upon business of the uncertainty created by the attitude of the law enforcement officers. Nonetheless, there is proof of some loss of business and plaintiff is indeed being deprived of the use of its property by the seizure.

Two possible theories might be relied upon to justify the seizures. One is a seizure *in rem* to confiscate a contraband article, such as counterfeiter's

1. This statute provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities se- cured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." As to this statute, see Negrich v. Hohn, 246 F. Supp. 173, 175 (W.D.Pa.1965).

2. Allegheny has 4 prints, Westmoreland 1.

plates, burglar's tools, contaminated food, or vehicles used to transport narcotics.

It is basic doctrine that moving pictures, notwithstanding the graphic and direct nature of the medium, are entitled to the same protection which the First Amendment [3] accords to other forms of freedom of speech and expression, Burstyn, Inc. v. Wilson, 343 U.S. 495, 501–502, 72 S.Ct. 777, 96 L.Ed. 1098 (1952); but that obscenity is not entitled to such constitutional protection, Roth v. United States, 354 U.S. 476, 485, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). But how is it to be determined whether a particular exhibition of a film constitutes obscenity? Prior restraint or censorship upon protected freedom of speech has been prohibited since before Blackstone's time. Dumbauld, The Bill of Rights and What It Means Today (1957) 123. When motion pictures were accorded protection as free speech they received the benefit of that principle. Cf. Times Film Corp. v. Chicago, 365 U.S. 43, 49, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961), where the exhibitors outfoxed themselves by relying on the "one bite" principle above without developing an adequate record in the case involved. The accepted rule is that the statutory scheme must make provision for a prompt, adversary judicial proceeding to determine whether the film is or is not obscene. Freedman v. Maryland, 380 U.S. 51, 58–59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). So far as we are aware, Pennsylvania has no discriminatingly drawn statute which meets these requirements, and which would authorize *in rem* seizures as a "clean-up" measure. Smith v. Crumlish, 207 Pa.Super. 516, 524, 218 A.2d 596 (1966); Com. v. Guild Theatre, 432 Pa. 378, 382, 248 A.2d 45

(1968). The seizures in the case at bar therefore can not be upheld on this basis. In fact there is little evidence in the record to show that such a basis was relied on by defendants. In response to leading questions by plaintiff's counsel some of the theatre managers said that the raiding officers said that they were "confiscating" the film. In the case of the Westmoreland county theatre, the manager admitted that the officers might have said they were holding the film as evidence.

The second theory, and that on which defendants in fact rely, is that the seizures were for the purpose of impounding evidence and were made as an incident to lawful arrests without warrant for a crime committed in the presence of the arresting officers. We now examine this contention.

It has long been the rule that things connected with the crime, as its fruits or means or instrumentalities of its commission or weapons or means to facilitate escape of the malefactor, may be seized when found at the time of a valid arrest on the person of the defendant or on the immediate premises where the arrest takes place. Dumbauld, The Bill of Rights and What It Means Today (1957) 73. A recent decision, Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 300, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), overruling Gouled v. United States, 255 U.S. 298, 309–311, 41 S.Ct. 261, 65 L.Ed. 647 (1921), permits seizure of *mere evidence*, as distinguished from instrumentalities of commission of crime. Even under the old rule, however, we think the film would qualify as a suitable object for

---

3. The First Amendment provides that "Congress shall make no law * * * abridging the freedom of speech, or of the press * * *." Since 1925 the Supreme Court has held that the "freedom" protected by the First Amendment is part of the "liberty" which the Fourteenth Amendment requires the States to respect. Dumbauld, The Bill of Rights and What It Means Today (1957) 133.

The Fourth Amendment provides that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Under current Supreme Court doctrine, this requirement also applies to the States. Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

seizure, if a valid arrest of the theatre managers or projectionists was made.

■ The right of peace officers to arrest without a warrant when an offense is committed in their presence is well established. Com. v. Bosurgi, 411 Pa. 56, 66–68, 190 A.2d 304 (1963); Com. v. Laniewski, 427 Pa. 455, 459, 235 A.2d 136 (1967); United States v. Martin, 386 F.2d 213, 215 (C.A. 3, 1967).

■ But whether or not an offense has been committed in the presence of an officer depends upon what facts are necessary to constitute the offense. An officer who witnesses fact A can not say that a crime has been committed in his presence if the crime requires facts B and C, not witnessed by the officers, in order to constitute the offense.

■ To constitute obscenity, under federal standards laid down by the Supreme Court of the United States, it is necessary, *inter alia*, that "the dominant theme of the material *taken as a whole* appeals to prurient interest." Roth v. United States, 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1957) [Italics supplied]. Reliance upon isolated episodes or excerpts will not suffice. Therefore an officer making an arrest without a warrant must have viewed the entire film before the offense (and the arrest and seizure incident thereto) can be validly established.

In the case of the Westmoreland County seizure, Assistant County Detective George H. Rue testified that on March 13, 1969, in company with others, he was present as a paying customer who had duly obtained a ticket and entered the premises in the normal manner to see the show. He viewed the entire film which began at 9:05 and ended at 10:50.

■ In the Westmoreland County case, therefore, we find a valid arrest and seizure of the film for use as evidence [4] at the trial. The Pennsylvania statutes conform closely to the requirements of the United States Supreme Court and are therefore not void on their face. Smith v. Crumlish, *supra*, at 520, 218 A.2d 596. There is therefore no reason why this prosecution in Westmoreland County should not continue. It is a normal and legitimate criminal proceeding, and will present in orderly fashion in a single litigation an opportunity for appropriate judicial determination of the question as to the obscenity *vel non* of the film, and the guilt or innocence of wrongdoing of the exhibitors thereof.

■ The general rules therefore apply, that equity will not enjoin criminal proceedings, In re Sawyer, 124 U.S. 200, 210–211, 8 S.Ct. 482, 31 L.Ed. 402 (1888), and that federal courts should be slow to presume that State courts will not respect federally created constitutional rights. Atlantic Freight Lines v. Pa. P.U.C., 109 F.Supp. 385, 387 (W.D. Pa.1952); Holiday Inns of America, Inc. v. Holiday House, Inc., 279 F.Supp. 648, 650 (W.D.Pa.1968); Stevens v. Frick, 259 F.Supp. 654, 657 (S.D.N.Y.1966), aff'd 372 F.2d 378 (C.A. 2, 1967), c. d. 387 U.S. 920, 87 S.Ct. 2034, 18 L.Ed.2d 973 (1967).

But how does the matter stand with respect to the Allegheny County seizures? Although a recess was taken to permit the arresting officers to be called, at the conclusion of the recess counsel for the Allegheny County defendants elected not to offer any testimony.

■ The rule therefore applies that an inference may be drawn that such testimony would not have helped defendants' case. Graves v. United States, 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021 (1893); United States v.

---

4. The retention of one print as evidence is reasonable and not oppressive. In view of the fact that the film itself is perhaps the best evidence, or at least indispensable evidence, on the question as to its nature, and of the fact that films are often cut or altered for showing at different theatres, it is important to establish the exact content of the film as exhibited on the occasion giving rise to the prosecution.

Jackson, 257 F.2d 41, 44 (C.A. 3, 1958); United States v. Restaino, 369 F.2d 544, 547 (C.A. 3, 1966). The same rule will apply, wherever applicable, and against both parties, by reason of the failure to show the film to the Court.

■ It may also be noted that the Allegheny County defendants filed no responsive pleading to the complaint within the period prescribed for that purpose, and may therefore be taken to have admitted all well-pleaded factual allegations, of a non-conclusory character, contained therein.

■ Thus the uncontradicted testimony of plaintiff may be accepted as true. In particular the witness David Arnett, manager of the Colonial Drive-in, a benevolent and truthful appearing man aged 70, for 35 years a school teacher, testified that he was arrested and the film confiscated at 9:30 P.M. The officers arrived on the premises at 8:55 and 9:05. The film started at 9:10, and after the arrest the theatre was permitted to finish the showing before the film was taken away. It is therefore obvious that the officers did not witness the entire film, as required by federal obscenity standards, and the arrest without warrant, and any seizure incident thereto, was invalid.

The same situation existed in the case of the other seizures. At the Strand in Oakland the testimony was that the officers came to the theatre at 11:00 P.M. The film was exhibited from 10:00 to 11:30. At the North Side Drive-in the officers came at 9:20, at the beginning of the film, but made the arrest at 10:45, before the conclusion of the showing. At the Greater Pittsburgh Drive-in the officers arrived at 9:30, and made the arrest at 10:10. The picture began at 9:15. The Allegheny County seizures are therefore invalid.

We shall therefore direct the return of the film seized by and in the possession of the Allegheny County defendants.

It will not be necessary to enjoin the prosecutions, which will doubtless collapse of their own weight in the absence of what would perhaps be the best evidence on the obscenity issue.

■ Under exceptional circumstances, it may be noted, a federal court may enjoin a State prosecution where the mere existence of the litigation, apart from its merits, could "chill" constitutional rights. Dombrowski v. Pfister, 380 U.S. 479, 487, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). See also Cox v. Louisiana, 348 F.2d 750, 753 (C.A. 5 1965). These are unusual, and perhaps even unorthodox, rulings, attributable to the history of peculiar obstructions placed by Southern States upon the exercise of civil rights by their black population. Such local circumstances often distort the symmetry of established legal doctrine, which is fashioned for the regulation of normal conduct.[5]

In *Dombrowski* the prosecution was obviously unmeritorious and doomed to futility, but was pursued with motives of harassment and vexation.

In this regard, what shall we say as to the motives of Allegheny County's District Attorney Robert W. Duggan with regard to salacious-type motion pictures?

It is common knowledge that his crusade was goaded by the stimulus of being prodded by the late Mr. Justice Michael A. Musmanno, and led to lengthy and still uncompleted litigation regarding another film, "Therese and Isabelle". See Com. v. Guild Theatre, 432 Pa. 378, 248 A.2d 45, *supra*, and Duggan v. Guild Theatre, at No. 83 March Term 1969 in the Supreme Court of Pennsylvania. According to the grapevine, heated discussion in the courtroom took place between Justice Musmanno and Justice Herbert B. Cohen. The latter expressed the view that the sponsor of the prosecution should not sit as a member of the tribunal to adjudicate it.

5. See the comments of Professor Alexander Bickel on Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). Bickel, The Least Dangerous Branch (1962) 51–54.

In any event, the record in the case at bar shows that "The Female" was exhibited uneventfully, and with no diligence displayed by the District Attorney, during six weeks in 1968 at a prominent downtown theatre. The practice of the industry is to show first-run films downtown, then to distribute them subsequently to suburban locations and drive-ins, such as those involved in the case at bar.

Then all of a sudden on March 7 and 8, 1969, four small suburban drive-ins were raided, and prints of the film seized.

Counsel for District Attorney Duggan undertake to explain this inaction during the metropolitan showing by saying that they did not know that "The Female" was an obscene film until a three-judge federal court in Kentucky decided that it was.[6]  Herblock and Hungerford might draw an amusing cartoon of the District Attorney's staff poring over the advance sheets of the *Federal Reporter* and *Federal Supplement* for the *dernier cri* as to the appearance of questionable movies, rather than consulting advertisements in the Pittsburgh newspapers or trade journals such as *Variety* or *Boxoffice*.[7]

Though an inference might be drawn from the District Attorney's inactivity followed by a subsequent *Blitz* seizing four prints of the same film with regard to the *Dombrowski* issue whether this was good faith formulation of a legal issue for presentation to a judicial tribunal *for determination or was* vexatious institution of knowingly unmeritorious proceedings doomed to futility but burdensome and harassing to the businessmen involved in the cinema industry, we prefer to draw no conclusions as to this issue on the present record. We believe that adequate relief to plaintiff will be provided by the return of the four prints held by Allegheny County authorities.

6. Cambist Films v. Tribell, 293 F.Supp. 407, 410 (E.D.Ky.1968).

7. Reliance on the Kentucky decision was offered as showing a prior judicial decision purportedly satisfying the require-

ments of Freedman and Crumlish, *supra*. Obviously the requirement of prompt adverse judicial determination of obscenity means such a remedy in the jurisdiction where the seizure is to be made.