## Commonwealth v. Schlotthauer

*Frederick F. Coffroth,* District Attorney, for Commonwealth.

*James B. Yelovich* and *Kimmel & Rascona,* for defendant.

COFFROTH, P. J., November 7, 1972.—This is an appeal by defendant from his summary conviction for speeding on the turnpike. He was operating a tractor-trailer rig in a 55 mile per hour zone, properly posted for speed and radar. State police officers Matassa and Leonard set up a two car radar surveillance. Matassa was the meter reader and Leonard was in the chase car about 50 feet ahead. Matassa called Leonard and reported a rig passing at 66 miles per hour; the meter is operative for about 500 feet to the rear and had been properly tested for accuracy. Leonard saw defendant's rig pass as he received the call; it was the only rig in the area and there was no question of identity. Leon-

ard chased, stopped defendant, informed him of the offense and issued a citation.

Defendant testified that he did not know how fast he was going because his speedometer and tachometer were not functioning properly; the malfunction was corroborated.

Defendant moves to dismiss the prosecution and reverse the conviction because:

1. The justice of the peace did not furnish a copy of the transcript to defendant or his counsel after defendant gave notice of appeal; and

2. The chase officer was not empowered to initiate the prosecution by means of citation because he did not personally read the radar meter and did not therefore "observe" the offense.

Defendant was found guilty by the justice of the peace after a hearing and consideration of the merits of the case. The purpose of an appeal to the court from such a summary conviction is to obtain a rehearing and reconsideration by the court of the merits, so as to determine guilt or innocence. But, if we grant the motion to dismiss, that will not only prevent this court from any consideration of defendant's guilt or innocence but will also free defendant from any legal responsibility for the charge against him regardless of guilt or innocence. This is so because, after dismissal, the charge cannot be refiled. The law allows 15 days after commission of an alleged vehicle code violation, for filing the charge: Act of April 29, 1959, P. L. 58, as amended, 75 PS §1201(a). This prosecution was filed in time but, if it is dismissed, it is now too late to file another.

Defendant's motion to dismiss raises the whole spectre of "legal technicalities," which might easily be treated briefly and summarily. But today courts face a crisis of public confidence. More than any other

single factor, public opposition to the disposition of cases on "legal technicalities" is at the root of the erosion of public confidence in the courts. Unfortunately, such criticism is often justified. We, therefore, take this occasion to analyze the problem because, as we see it, it is the duty of judges who are the object of this criticism to meet it squarely, resisting it where not valid, acknowledging and rectifying it where justified. At bottom, the power and influence of courts must rest upon public confidence, because judicial power like all governmental power in a democracy is derived from the consent of the governed.

The basic purpose of law is the protection of society. Even the civil law which concerns itself with private disputes is designed to encourage and advance civilized living together. The courts "are not playthings for every private stratagem. Indeed, we provide a place and facilities for the resolution of private controversy only because of the paramount public concern for justice and for the peaceful resolution of conflict, and only when those larger interests are served": Renaldo v. Vivian, 26 Somerset 340, 355. The criminal law is designed to protect society even more directly than the civil law, by specifically defining, making unlawful and providing sanctions upon conduct regarded as anti-social. See 10 P. L. Encyc. Criminal Law 343, §2. This is true not only as to crimes which are evil in character (malum in se); it is also true of the regulatory offenses (malum prohibitum) which are not evil in themselves but enforcement of which is essential to orderliness and safety in human co-existence, such as the rules of the road in The Vehicle Code.

The cohesion, orderliness, progress and general quality of any society depends upon the just application of law. Important as are the legislative and executive branches of government in the making of law, it

is the judge who daily applies law to concrete situations as arbiter between citizen and citizen and between citizen and government. Judges, therefore, more than any other public servant, must take responsibility for laying the ground for public respect of law. "What the population believes about the application of the laws counts much more than what the laws provide": 58 A.B.A. Journal, September, 1972, page 954.

These basics have been eloquently expressed by the late Arthur T. Vanderbilt, Chief Justice, Supreme Court of New Jersey, one of America's most effective and dedicated apostles of law reform, in his "The Challenge of Law Reform" (Princeton University Press 1955), pages 4-5, as follows:

"It is in the courts and not in the legislature that our citizens primarily feel the keen, cutting edge of the law. If they have respect for the work of the courts, their respect for law will survive the shortcomings of every other branch of government; but if they lose their respect for the work of the courts, their respect for law and order will vanish with it·to the great detriment of society, for it surely does not have to be argued that respect for law is all important for the survival of popular government. A decision based on technicalities or surprise, or a trial or a decision unduly delayed, or even a case of judicial bad manners can kill respect for law more disastrously than any disagreement on some abstruse question of substantive law."

Our Pennsylvania Supreme Court in Commonwealth v. Frazier, 420 Pa. 209, 214 (1966), inveighed against legal technicalities, as follows:

"The practical result is that *technical* rules must not be adopted which will seriously impair or destroy the underlying and basic principle of the criminal law, i.e., the protection of society." (Italics supplied.)

That court has also said that its Rules of Criminal

Procedure "are intended to provide for the just determination of every criminal proceeding" (Pa. R. Crim. P. 2), and that in applying its Rules of Civil Procedure the "court at every stage of any such action or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties": Pa. R. C. P. 126. In Peoples Natural Gas Company Appeal, 399 Pa. 226, 234, the late Mr. Justice Musmanno, in his colorful language, spoke for the court on the subject:

"The day when an innocently aggrieved party could be denied a hearing in the courts because of a *technical* mischance is happily in the past. The attainment of justice is over the highway of realities and not through the alley of *technicalities*." (Italics supplied.)

In criminal cases the Commonwealth is a party equally with the defendant; both are entitled to a fair trial and a just determination; neither should be denied a hearing on the merits because of a "technical mischance." See Commonwealth v. Lynn, 26 Somerset 207, 210, and Commonwealth v. Gockley, 411 Pa. 437, 449.

This writer has several times complained of the evil of technical decision. In Commonwealth v. Ansell, 26 Somerset 248, 254, we said:

"There is something seriously wrong with any system or rule of law which repeatedly or frequently frees guilty persons or prevents the trial of a case on its merits."

And in Commonwealth v. Banovich, 56 D. & C. 2d 383, 396, 26 Somerset 268, 280, 85 York 122, 128, we said:

"We thus encounter the competing interests of society and of the individual. We frequently state as our core of value that as between convicting the innocent and discharging the guilty, we prefer the latter; but

there is a great danger to society as a whole from any legal system or rule of law which does either with any degree of frequency. This is as true of minor summary offenses, as it is of misdemeanors and felonies. Summary cases are numerous and provide for many people their first, if not only, contact with the judicial system; upon that experience they form their estimates of both the system and of right and wrong. It is axiomatic but frequently overlooked that courts not only judge, they teach; they help to set the tone and foundation for society's basic values. Whenever the judgments of courts are frequently unrelated to the truth and merits of the cause, but are grounded upon technical or administrative reasons unrelated or seemingly unrelated to those larger considerations, they generate not only disrespect for the courts but a general atmosphere that 'getting away with it' is standard procedure."

When some of the guilty thus get away on technicality, and others do not, judicial treatment is thought unequal and to be playing favorites. Too many people are cynical about courts, and consider them as not on the square. The judiciary cannot afford to allow its processes to earn such a reputation or to become an instrument which thus subverts law enforcement and respect for the judicial system. In Banovich, we said at page 281:

"And in terms of respect for law, the courts must take care that they do not make their own unwitting contribution to lawless attitudes. Such widespread social notions are long in coming and are founded not upon recent cataclysms, but upon the slow accumulation of specific instances over the years. In the same way the law is built as well as destroyed, just as surely as the slow, continuous drip of water inexorably fissures the greatest of rocks."

It is therefore incumbent upon us to find the time,

energy, resources and social concern necessary to give to each case, however small, a fair trial and decision on its merits, without being distracted from that endeavor by trivial procedural matters. A legal technicality may be generally defined as a procedural error which, if allowed to determine the outcome of the case, prevents a consideration of the merits of the cause, a high price to pay. When a case is disposed of on a technical procedural error, we say in effect that guilt or innocence has nothing to do with it. To warrant such radical surgery, the error must be serious indeed. It is therefore fundamental that a procedural error will be disregarded as harmless unless it is a mandatory jurisdictional requirement of law, or unless the party asserting the error was irremediably prejudiced by it, or unless the procedure serves some public value or policy which equals or exceeds in importance the question of guilt or innocence itself. See 10A P. L. Encyc. Criminal Law, §958; 29 P. L. Encyc. Pleadings §151 and 18 P. L. Encyc. Indictment and Information §83; Pa. R. Crim. P. 114.

Against this background of basic values, we will test the sufficiency of defendant's contentions.

*Transcript Copy:*

The Minor Judiciary Court Appeals Act of December 2, 1968, P. L. 1137, No. 355, §1, 42 PS §3001, et seq., imposes upon the justice of the peace the duty to furnish a copy of the transcript to any defendant who takes an appeal from the decision of the justice in a summary criminal case. Here the transcript copy was not furnished, but this procedural error was harmless and will, therefore, be disregarded.

First, the transcript copy is not essential to the jurisdiction of the court to entertain the appeal, and defendant does not so contend. He wants the court to have jurisdiction so that it may reverse the conviction,

for if there is no jurisdiction in the court the conviction stands. Accordingly, this case must be distinguished from those in which appeals are quashed for failure to comply with a procedural step essential to perfecting the appeal, such as failure to give a required notice of appeal. See Commonwealth v. Dadey, 26 Somerset 373; Commonwealth v. Budzina, 26 Somerset 378; Trembush v. Snyder, 27 Somerset 103; McCormick v. Herring, 26 Somerset 235; Callihan v. Marhefka, 27 Somerset 68; P. L. Encyc. Appeals §200. Here, defendant gave the proper appeal notice and his appeal was validly taken under the statute: 42 PS §3003(c).

Second, defendant was not irremediably prejudiced by not receiving the transcript. The omission was very easily remedied had defendant made complaint. Defense counsel had received at least two weeks advance notice of the hearing date for the appeal, giving ample time to study the original transcript on file or to request the copy from the justice of the peace, or to request the aid of the court in obtaining a copy or a continuance of the hearing until the transcript is furnished. In fact, defendant was not prejudiced; he did not claim prejudice; he did not want a copy of the transcript; he wanted merely to use the absence of a copy as an excuse to escape responsibility for the charge against him.

Third, the transcript copy requirement serves no important public value or policy that its enforcement should take precedence over the question of guilt or innocence. A rigid rule which dismisses or strikes down an entire legal proceeding because of a procedural error, which is neither prejudicial nor of jurisdictional character, is often called a prophylaxis, that is, a preventive rule of law. Its objective is to prevent repetition of the error by "teaching" a subordinate court or public officer or litigant, the justice of the peace in this case, not to err again. The exclusionary rule in illegal

search and seizure cases is an example of a prophylaxis whose purpose is to deter or prevent law enforcement officers from violating the Bill of Rights; it is supposed to "teach" them to follow proper procedure by prohibiting the use in evidence of the illegally seized evidence against defendant no matter how truthfully incriminating it is and even though the consequence is to free the guilty. The only justification for that is the preservation of a basic right of constitutional stature whose denial is said to be a greater danger to society than freeing the criminal. See Commonwealth v. Cohn, 26 Somerset 320, 334, and Commonwealth v. Jacobs, 27 Somerset 142, 150. The right to the transcript copy cannot be equated with the constitutional right to be free from unreasonable search and seizure, either in consequences to defendant or to society.

The Pennsylvania Supreme Court has recently debated and imposed a prophylactic rule absolutely forbidding private communications between trial judge and a deliberating jury, regardless of actual prejudice, because of the ever present great potential for irremediable prejudice which is inherent in such communications. See Kersey Manufacturing Co. v. Rozic, 422 Pa. 564; Yarsunas v. Boros, 423 Pa. 364; and Commonwealth v. Milliner, 442 Pa. 537. No such potential prejudice inheres in the failure to furnish a transcript copy on a summary conviction appeal.

Historically in Pennsylvania, perhaps the most widespread use or misuse of the prophylactic rule has occurred in justice of the peace cases which are brought up to the local court for review on appeal or certiorari. As we said in Commonwealth v. Papinchak, 27 Somerset 288, 291, lower court cases are a "veritable graveyard of dismissed but meritorious prosecutions" for summary offenses. The prophylactic effort has been

a failure with the minor judiciary. In Banovich, supra, we noted at page 281.

"We are many times told that the only way to teach the minor judiciary the error of their ways is to dismiss cases not supported by proper transcripts . . . But that is a hopeless dream. The therapy hasn't worked for over a century. Worse are the harmful social consequences of that 'educational' effort, as above pointed out. Instead of educating the squires to make better transcripts, the danger is that we may 'educate' people to think that there are numerous and easier ways of avoiding punishment for crime than by being not guilty."

It is or should be obvious by now that the transcript copy is but a minor procedural omission, unworthy of a prophylactic rule which would free defendant, not only without a determination by the court of his guilt or innocence, but after he has been tried and found guilty by the justice of the peace. In the most important civil and criminal cases we have never regarded failure to furnish a copy of a paper (other than process subjecting the person to the jurisdiction of the court, or one essential in perfecting an appeal, not here involved) as a ground for dismissal; if the party has been prejudiced by failure to receive a copy, an appropriate remedial order is made. The same rule should apply to summary convictions which are much less serious. We must not develop legal myopia which cannot distinguish the vital from the trivial.

We should now go to a consideration of the appeals statute itself which we find confirms our conclusion. This is the consequence of the phraseology of subsections (d) and (e) of section 3 of the act. Subsection (d) provides as follows:

"The issuing authority shall within twenty days

after service upon him of a notice of appeal file with the officer of the court his transcript of proceedings, the amount of fines and costs and bail received in said case, if any, the summons or warrant issued by him, the original copy of the complaint and the bail undertaking executed by the defendant, if any; he shall also serve personally or by certified mail a copy of his transcript upon the attorney for the defendant, or if none, upon the defendant."

It will be observed that the quoted subsection utilizes two independent clauses, separated by a semicolon, to impose two separate duties upon the justice of the peace: (1) to *file* with the clerk of court his transcript and the other papers specifically enumerated in the first clause of the subsection, and (2) to *serve* on defendant or his counsel a copy of the transcript as provided in the second clause. Here the justice of the peace complied with the first clause by filing the transcript and other papers with the clerk, but did not furnish a copy of the transcript to defendant or his attorney.

The legal consequences of failing to comply with subsection (d) are expressly stated in subsection (e), which provides as follows:

"The failure of the issuing authority to file the transcript and other papers of the proceeding as required above shall result in rendering the conviction a nullity and the officer of the court with whom the notice of appeal was filed shall, upon praecipe of the defendant, enter a judgment of non pros; upon presentation of a certificate of a judgment of non pros issued by the officer of the court, the issuing authority shall refund to the defendant the fine and costs previously paid and make the appropriate entry upon his records."

From this quoted language it is plain that failure to file the transcript and other papers with the clerk

within the 20 day period, as prescribed in the first clause of subsection (d), mandates a dismissal or reversal of the conviction; but it is equally plain that that consequence applies only to the failure "to file the transcript and other papers of the proceeding as required above" in the first sentence of subsection (d), and does not apply to the failure to serve a copy of the transcript. The intention of the legislature thus becomes clear: the requirement of filing of the transcript and papers in the office of the clerk is mandatory because of the prophylactic language of subsection (e), but the requirement of service of a copy of the transcript upon defendant or his counsel is directory and not mandatory. This conclusion is consonant with the general canon of interpretation that the attachment of a specific consequence to a specific violation in a statute or rule, implies the exclusion of that consequence for any other violation with respect to which it is not mentioned: Pane v. Department of Highways, 422 Pa. 489; Cali v. Philadelphia, 406 Pa. 290. This conclusion also reflects the greater importance of the filed papers as the basic record without which the court cannot properly review the case on appeal, as compared with the unessential transcript copy.

We need not fret about the delinquency of the justice of the peace. The court will readily come to the aid of defendant to assure that he will obtain his copy, short of freeing him entirely, when such aid is sought. In addition, under modern procedures, disciplinary action is available against a magistrate who wilfully refuses or consistently fails to fulfill any duty prescribed by law.

We must respectfully disagree with other common pleas courts which hold contrary on this issue.

*Did the Arresting Officer Observe the Violation?*

Pennsylvania Rule of Criminal Procedure 131(a) requires that a citation may be issued only by a police officer who "observed" the offense. The rule reads as follows:

"When the commission of a summary offense is *observed* by a police officer, he may, in his discretion, issue a citation to such person charging the violation of said summary offense." (Italics supplied.)

The chase officer was stationed only 50 feet ahead of the meter car and saw defendant passing on the highway in the course of the speeding violation, as the violation was reported to him by the reading officer. The effect of defendant's argument is that unless the chase officer personally reads the meter, he did not "observe" the violation. Under these circumstances we conclude that the chase officer did observe the offense and that the citation was lawfully issued.

The citation procedure authorized by the Criminal Rules is new to our law. It simplifies traffic arrest and prosecution procedure for both motorist and officer. The rules initially prescribed the system only for Bucks, Erie and Luzerne Counties on an experimental basis. See Order of Pennsylvania Supreme Court dated January 31, 1970, effective May 1, 1970, No. 66 Criminal Procedural Rules Docket No. 1. By amending order of July 1, 1970 (No. 71 Criminal Procedural Rules Docket No. 1), the court authorized use of the citation system in other judicial districts by local court order. The system has been markedly successful, and was adopted in this county effective January 1, 1972, by our order of July 1, 1971 (No. 33 Miscellaneous 1970). By amending order of June 26, 1972 (No. 6 Criminal Procedural Rules Docket No. 2), the Supreme Court mandated the plan for all judicial districts except Philadelphia. But the requirement that the violation be observed by the arresting officer is not new.

Basically, the citation system involves an arrest for a summary offense without a warrant which in turn requires that the offense be committed in the presence of the officer: Commonwealth v. Laniewski, 427 Pa. 455, 459, citing Commonwealth v. Rubin, 82 Pa. Superior Ct. 315. Presence is not a requirement in warrantless arrest for felony: Commonwealth v. Bosurgi, 411 Pa. 56.

Courts are not in complete agreement as to what constitutes an arrest. A Fourth Amendment "seizure" of the person occurs whenever a police officer accosts the person and restrains his freedom to walk away: Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889. Every arrest is a seizure, but every seizure is not an arrest, and there is difference of opinion as to just when a seizure becomes an arrest. See Rios v. U.S., 364 U.S. 253, 4 L. Ed. 2d 1688; Fuller v. U.S., 407 F. 2d 1199 (C.C.A. D.C. 1967); Gilbert v. U.S., 366 F. 2d 923 (C.C.A. 9th 1966); Wilson v. Porter, 361 F. 2d 412 (C.C.A. 9th 1966); Cook v. Sigler, 299 F. Supp. 1338 (D.C. Neb. 1969); U.S. ex rel. Anderson v. Rundle, 274 F. Supp. 364 (E.D. Pa. 1967); U.S. v. Bonanno, 180 F. Supp. 71 (S.D. N.Y. 1960); Commonwealth v. Hicks, 434 Pa. 153, 157; Commonwealth v. Talierco, 42 D. & C. 2d 367; Commonwealth v. Ambrose, 21 Bucks 1; Commonwealth v. Proie, 66 Dauph. 4; Commonwealth v. O'Donnell, 62 Lanc. 324; Commonwealth v. Silverman, 62 Lanc. 25; Commonwealth v. Bothwell, 94 Pitts. L. J. 451. In motor vehicle cases, the mere stopping of a vehicle for observation or interrogation may be distinguishable from a stop to inform of a violation for which prosecution is later begun by filing an information or complaint, and from a stop to issue a citation which begins the prosecution under Pa. R. Crim. P. 102(6) as in this case. A seizure of the latter type has been held to be an arrest: State v. Cook, 194 Kan. 495,

399 P. 2d 835 (Kan. 1965). An arrest on "observation" is the same as an arrest on "view" or on "sight", and these are but shorthand expressions for the common law requirement that the arresting officer be "present" at the commission of a misdemeanor or summary offense in order to arrest without warrant. Compare Pa. R. Crim. P. 102(3) through (7). The requirement of Pa. R. Crim. P. 131(a) that the offense be "observed" by an officer issuing a citation is to be construed as meaning that the officer must be present at the commission of the offense in accordance with the common law requirement of presence in a warrantless arrest for nonfelony.

There is some authority in other jurisdictions for the proposition advanced by counsel for defendant that an offense is not committed in an officer's presence unless he has personal knowledge of every element of the offense: Cambist Films, Inc. v. Duggan, 298 F. Supp. 1148 and 420 F. 2d 687; Restatement 2d, Torts, §119, Comment m; 6 C.J.S. Arrest, §5b; 5 Am. Jur. 2d, Arrest, §31. But happily that is not the law of Pennsylvania; the rule here is that an officer may make a nonfelony arrest without warrant where he has probable cause to believe that the offense is being committed in his presence: Commonwealth v. Garrick, 210 Pa. Superior Ct. 124, 126, and that the probable cause may be founded either on his own knowledge or on the information of others: Commonwealth v. Rubin, supra, 321 and 324; Commonwealth v. Sullivan, 91 Pa. Superior Ct. 544; Commonwealth v. Bettiker, 11 Mercer 393. Compare Commonwealth v. Pincavitch, 206 Pa. Superior Ct. 539, Commonwealth v. Hoover, 55 D. & C. 2d 34, and Commonwealth v. Steever, 95 Dauph. 62.

Accordingly, officer Leonard had reasonable cause to believe that defendant was committing an offense

in his presence, and this in law is an offense "observed" by him or committed in his "sight" or "view," justifying the arrest without warrant and his issuance of the citation. The same conclusion on similar facts was reached in State v. Cook, supra, where traffic was being checked by a team of three officers, two in the air in an aircraft and one on the ground in the chase car. The officers above determined defendant's speed by checking it against previously measured highway markings with stop watches, informed the chase officer by radio who stopped defendant and issued a traffic notice similar to our citation. The court held this a valid warrantless arrest for a misdemeanor committed in the presence of the issuing officer. Compare 75 PS §1002(d)(1), which authorizes the timing of rate of speed in business or residence districts by two officers, one at each end of a measured stretch, and 75 PS §1002(d.1)(1), authorizing the timing of rate of speed by "officers" through the use of radar. Additionally, from a practical standpoint defendant's strict interpretation of the term "observed" as used in the rule would effectively end the use of the citation system with the 2-car radar system now employed by the State police. That would make the procedure for arrest and prosecution in radar speeding cases more cumbersome by forcing the police either to abandon the 2-car system or the use of the citation system. This was not likely the intention of the Supreme Court in making Rule 131(a). The Rules of Criminal Procedure were designed to simplify procedure, not to complicate it, as Rule 2 expressly states:

"These rules are intended to provide for the just determination of every criminal proceeding. They shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay and as nearly as may

be in consonance with the rules of statutory construction."

Moreover, traffic laws must respond to modern conditions. The antagonisms prevalent some decades ago toward strict enforcement of traffic law is inadequate to our fast and crowded streets and highways. The matter was well expressed in State v. Cook, supra, at page 498, as follows:

"When may it reasonably be said that an offense against the traffic laws has been committed in the presence of the arresting officer? The answer must take account of modern conditions and, especially, the mobile nature of our population. Modern man is, indeed, a mobile mammal. His locomotion is endless; his travels, constant; his craving for speed, insatiable. High speed motors and superhighways combine to gratify his passion for high velocities. It is against this background that today's traffic officer must operate. Of necessity, new techniques of detection and apprehension have been developed and new scientific tools have been placed at the officer's command."

And again at page 499:

"In view of these circumstances, we are of the opinion that the offense with which Wade charged the defendant must be deemed to have been committed in Wade's presence. The law does not blindly close its eyes to reason. While holding fast to basic truths, it acknowledges the inevitability of change and seeks to adapt itself to new conditions. For us to hold that Wade's arrest of the defendant was illegal would, under the conditions prevailing in this case, violate common sense."

Accordingly, we respectfully decline to follow the decisions of other courts taking a contrary position. See Commonwealth v. Kopay, March term, 1972, no. B-48 (Cambria County).

*Was Defendant Violating the Speed Limit?*

We finally come to the merits of the case on the issue of speeding. The officer's testimony has made out a case of unlawful speeding, and there is no denial of it. Defendant says he does not know how fast he was going, because his speedometer and tachometer were not functioning properly. But malfunctioning equipment is not a defense to a speeding charge, even for an employe driver who does not own the vehicle or control its maintenance. See Sladky Motor Vehicle Operator License Case, 213 Pa. Superior Ct. 403 and Commonwealth v. Buchser, 185 Pa. Superior Ct. 54. It may be that a motorist may be excused from violating the speed limit when he is faced with a compelling emergency, but no such condition here existed. See Commonwealth v. Yoder, 27 Somerset 155; and compare Weinstein License, 49 D. & C. 2d 150, and Commonwealth v. Trice, 26 Somerset 260.

### ORDER

Now, November 7, 1972, the praecipe for non pros is quashed. The motion to dismiss is denied. We find defendant guilty as charged and the judgment of the justice of the peace is affirmed. Costs on defendant.