Emerman et ux., Appellants, *v.* Baldwin et al., Appellants.

562

Argued April 17, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

564

*William W. Knox,* for plaintiffs.

*James P. Bryan,* with him *Clarence T. Bryan, Paul B. Joslin,* and *Bryan, Joslin and Bryan,* for defendants.

OPINION BY ERVIN, J., June 11, 1958:

On March 15, 1952 one of the plaintiffs, Allen H. Emerman, visited defendants' offices to inquire about renting a house from defendants which they were then erecting. The defendants agreed to lease the property to the plaintiffs for a period of two years commencing on or about June 1, 1952 at a rental of $170.00 per month. One of the defendants at that time told the plaintiff: "All right, Allen. You have a deal. The place is yours." Plaintiff inquired about signing a lease and was told to wait until the house was ready for occupancy. The reason for the delay in the signing of the lease was that the parties did not know exactly when the construction of the house would be completed and therefore did not know the exact date upon which to commence the term of the lease. At plaintiff's request, the defendants gave to him the following written memorandum:

"March 15, 1952

To: Mr. Allen Emerman and his wife,

I am writing this letter to you to let you know that the house which we are building on 4710 Sunnydale Blvd. will be ready for occupancy approximately, **June 1, 1952.**

We will rent this house to you as soon as it is ready for occupancy on or before June 1, 1952, for a period of two (2) years, at $170.00 per month, subject to the proper execution and delivery of our standard lease form. We shall not be held responsible for delay in construction caused by government regulations, strikes, or lockouts.

Very truly yours,
BALDWIN BROTHERS, INC.
/s/ J. Robert Baldwin
J. Robert Baldwin, President"

JRB/gw

The terms of defendants' standard lease form were well known to plaintiffs. The plaintiffs on various occasions offered to pay the first month's rent and execute a lease but each time were told by the defendants that they should wait until construction of the property was completed. On May 29, 1952 the plaintiffs sent a telegram from New York to the defendants advising that Mrs. Emerman would come to the defendants' office on June 4 or 5 to complete arrangments to move in. As of May 27, 1952, the defendants prepared a contract for the sale of the property to one Edward R. Clapper and wife at a price of $22,000.00 and delayed execution of the said contract until the third day of June, 1952, because of the outstanding agreement with the plaintiffs. On June 5, 1952 the defendants refused to accept rent from plaintiffs and also refused to execute a lease to them. On June 9, 1952 plaintiffs filed a bill in equity for specific performance and damages and sought a preliminary injunction. The court granted a rule the same day "upon consideration of the foregoing Bill in Equity and injunction affidavits", returnable at 3:00 p.m. June 9, 1952. The papers were served upon the defendants on June 9, 1952 at 1:50 p.m. After the time set for the

return of the rule for the preliminary injunction, the court, on June 9, 1952, granted a preliminary injunction "enjoining and restraining the defendants, their agents, servants and employees from selling or transferring title to the premises . . . and from interfering with the taking of possession of said premises by the plaintiffs until further order of the Court." On June 12, 1952, within five days, as provided by the then existing rules, motions to dissolve and to continue were filed. Both were continued to June 13, 1952 at 3:00 p.m., again within the allotted five-day period from the allowance of the preliminary injunction. On June 18, 1952 plaintiffs moved to amend the injunction affidavit by adding thereto the following words: "and that immediate and irreparable loss or damage will result to the plaintiffs before the matter can be heard on notice." On June 27, 1952 the court made an order discharging the rule to dissolve and granting the motion to continue the preliminary injunction, deleting, however, from the order of June 9, 1952 the words "and from interfering with the taking of possession of said premises by the plaintiffs until further order of the court." Defendants' preliminary objections were overruled and an answer and reply were filed. Plaintiffs having withdrawn their demand for specific performance and the parties having agreed at a pre-trial conference upon the issues to be decided at the trial, the case proceeded to trial to determine if either party had sustained damages. After the trial the chancellor filed an adjudication, finding that there was a valid contract or lease and awarding plaintiffs $50.00 damages. Plaintiffs filed exceptions, claiming that insufficient damages had been allowed by the court. Defendants filed exceptions, claiming that they should have been allowed damages for the period of time that the preliminary injunction prevented them from leas-

ing or selling the property. The court below overruled all of the exceptions and both parties appealed to this Court.

The principal question for determination is whether a contract had been entered into for the leasing of the property. We agree with the conclusion of the court below that such contract did exist. A chancellor's findings of fact, confirmed by the court in banc on exceptions, have the weight of a jury's verdict: *Willwerth v. Dunlap*, 391 Pa. 12, 137 A. 2d 269. It is the contention of the defendants that since the written lease had not been executed, the contract was incomplete and would not support an action either for specific performance or damages for its breach. This situation has been dealt with quite recently by our Supreme Court in *Moudy v. W. Va. Pulp & Paper Co.*, 385 Pa. 39, 42, 43, 121 A. 2d 881, where the Court said: "We held in Taylor v. Stanley Co. of America, 305 Pa. 546, 552, 158 A. 157: 'Where all the terms of a contract are agreed upon and its reduction to writing is provided for, merely for proof as to its terms, such provision for a written contract is not inconsistent with a present contract, and this is *especially true where the thing to be done is provided for in a written memorandum*. The minds of the parties having met and reached an accord as to the essential provisions of the contract, such writing would simply exhibit just what they agreed upon and understood.' (Italics supplied). Although a formal contract is to be thereafter executed, if the terms have been agreed upon legal obligations may arise: Morganstern Electric Company v. Coraopolis Borough, 326 Pa. 154, 157, 191 A. 603.

"In Schermer v. Wilmart, 282 Pa. 55, 127 A. 315, we upheld as a binding contract a receipt given for a down payment on the purchase price of land even

though it required further down payment and provided that 'a regular agreement of sale' would thereafter be prepared. We there said, at page 58: 'The mere fact that the receipt contemplated a more formal document to be drawn in the future, does not alone defeat the right to [specific performance].'

"More recently in Onyx Oils & Resins, Inc. v. Moss, 367 Pa. 416, 420, 80 A. 2d 815, we approved the same principles set forth in Nicholls v. Granger, 40 N.Y.S. 99, which case followed as authority Sanders v. Pottlitzer Bros. Fruit Co. (N.Y.) 39 N.E. 75. In the latter the Court held, at page 76: 'But here the contract was already in writing, and it was none the less obligatory upon both parties because they intended that it should be put into another form, especially when their intention *is made impossible by the act of one or the other of the parties* . . . A stipulation to reduce a valid written contract to some other form cannot be used for the purpose . . . of evading the performance of those things . . . mutually agreed upon by such means as made the promise or assent binding in law.' (Italics supplied.)

"In this case, as pleaded, the terms were full and complete and were mutually understood and agreed upon. The minds of the parties had met, and there was a valid and binding contract. The later instrument, rendered impossible of execution because of defendant's own act, was not a prerequisite to right of action by plaintiffs."

The chancellor found that the provisions of the defendants' standard lease form were known to the plaintiffs and that these provisions were incorporated by reference into the contract made on March 15, 1952. The minds of the parties had met and reached an accord as to the essential provisions of the lease, to wit: the description of the property to be leased, the term

of the lease and the rental, and the other provisions of the lease were minor details with which the parties were familiar and upon which their minds had also met. It is also clear that the defendants regarded the negotiations of March 15, 1952 as a binding contract. During the latter part of May defendants had a chance to sell the property at an advantageous price to the Clappers and actually prepared a contract dated May 27, 1952, the execution of which was postponed because the defendants believed their agreement of March 15 to be in existence until June 1. If the defendants had regarded the memorandum as a mere offer to lease, unsupported by a legal consideration, they could have rescinded the offer in writing and consummated their sale to the Clappers. Instead of doing this, they waited until June 3, 1952 before executing the Clapper contract. Furthermore, when one of the defendants said to the plaintiff: "All right, Allen. You have a deal. The place is yours.", he clearly expressed an understanding that a valid and binding contract had been entered into. In modern parlance the word "deal" is often synonymously used for the word "agreement" or "contract." Having reached the conclusion that there was a valid and binding agreement to lease on March 15, 1952, it is clear that the defendants are not entitled to damages because of the preliminary injunction in the early stages of this litigation. A contract to lease may be the subject of specific performance the same as any other contract pertaining to the sale of real estate: *Kaufmann v. Liggett,* 209 Pa. 87, 92, 58 A. 129; *Moyer v. Diehl,* 139 Pa. Superior Ct. 59, 64, 65, 11 A. 2d 651; *Farley v. Stokes,* 1 Phila. 30. The court below, in the exercise of a sound discretion, could grant a preliminary injunction to preserve the status quo: *Pa. P. U. C. v. Israel,* 356 Pa. 400, 407, 408, 52 A. 2d 317; *Mahanoy Twp. Authority v. Draper,* 356 Pa. 573, 576,

52 A. 2d 653. As originally worded, the preliminary injunction not only restrained the sale of the premises but also restrained the defendants "from interfering with the taking of possession of said premises by the plaintiffs until further order of the Court." Defendants argue that this in effect gave possession of the premises to the plaintiffs. While it is true that originally a preliminary injunction may not be used to take property out of the possession of one party and put it into the possession of another, this is only because courts have been loath to grant mandatory orders in the preliminary stages of the injunctive process. Justice SHARSWOOD, in *Audenried v. Phila. & Reading R. R. Co.*, 68 Pa. 370, at page 375, very clearly describes the several kinds of injunctions in the following language: "There are two kinds of injunctions in courts of equity. The one is preliminary or interlocutory; the other final or perpetual. The object of the first in general is simply preventive—to maintain things in the condition in which they are at the time until the rights and equities of the parties can be considered and determined after a full examination and hearing. A preliminary injunction is never awarded, except when the rights or equity of the plaintiff are clear, at least supposing the facts of which he gives prima facie evidence to be ultimately established.

"All injunctions are generally processes of mere restraint; yet final injunctions may certainly go beyond this and command acts to be done or undone. They are then termed mandatory. They are often necessary to do complete justice. But the authorities, both in England and this country, are very clear that an interlocutory or preliminary injunction cannot be mandatory."

In the present case possession never was actually transferred from the defendants to the plaintiffs and

therefore the language in the preliminary injunction was harmless. Furthermore, the mandatory language remained in the preliminary injunction only from June 9, 1952 until June 28, 1952, when the court deleted it. The court did, however, have power to prohibit the sale of the premises in order to preserve the status quo. This is the real purpose of a preliminary injunction.

It is also argued that plaintiffs could not have suffered irreparable injury because the standard lease form of the defendants contained a provision giving to defendants the right to terminate the lease on 10 days' written notice and making it obligatory upon the plaintiffs to vacate within 10 days from the date thereof. It is not reasonable to suppose that the defendants would enter into a two-year lease and then shortly thereafter terminate it. Furthermore, the specific provision in the written agreement of March 15, 1952 that the defendants would lease the premises to the plaintiffs for a period of two years would nullify any provision in the printed language of the standard lease form. This question is not before the Court at the present time because the defendants never attempted to exercise the alleged right of termination.

It is also contended that the lack of irreparable injury is confirmed by the court's eventual award of damages to the plaintiffs in the amount of $50.00. This does not mean that the plaintiffs had not actually suffered greater damages. An examination of the record will reveal that a greater amount of damages was not realized because of the difficulty of proof encountered by the plaintiffs. This also is one of the well recognized grounds for the assumption of equitable jurisdiction.

Defendants also make the complaint that the preliminary injunction had been granted ex parte. This is of no importance in view of the fact that defendants

had notice of the original hearing and that a hearing was actually held within five days after the issuance of the original preliminary injunction. The defendants appeared on June 12, 1952, within the original five-day period from the granting of the preliminary injunction, and filed a motion to dissolve the same. The rule to dissolve was discharged on June 28, 1952. We can see nothing irregular in this procedure.

The plaintiffs, in their appeal, assert that they were allowed inadequate damages. Mrs. Emerman was not permitted to recover damages for psychic suffering. Section 341 of Restatement, Contracts, outlines the circumstances under which such damages are recoverable in a breach of contract action and limits them to instances where the breach is wanton or reckless and caused bodily harm and where the contract is to render a performance of such a character that the defendant had reason to know when the contract was made that the breach would cause mental suffering. None of these conditions were met by the plaintiffs.

We now turn to the other elements of damage claimed by the plaintiffs. Section 330 of Restatement, Contracts, sets forth the general rule that compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise, it must be shown specifically that the defendant had reason to know the facts and to foresee the injury. In *Harman v. Chambers*, 358 Pa. 516, 521, 57 A. 2d 842, the Court said: "Generally speaking, the measure of damages applicable in a case of breach of contract is that the aggrieved party should be placed as nearly as possible in the same position he would have occupied had there been no breach. In

other words, he is entitled to be reimbursed for the money actually paid out and for all reasonable and proper expenses incurred on the faith of the contract."

As a result of the breach, plaintiffs had to put their furniture in storage for 13 months at a cost of $357.50. They bought carpet and a dinette set specifically for this property at a cost of $864.68. Two love seats for the fireplace cost $450.00. They are now using the carpet in their present house but it isn't right. They spent $25.00 for an architect to make plans for them; they paid $25.00 for the services of a decorator; they had two round trips to New York and, for this, the expense of taking the Empire State Express at $52.00 each.

In this connection we approve the able language of Judge Laub in the court below: "Bearing in mind that this was a lease for two years and not for an extended period of time, it does not seem reasonable to assume that defendants must have foreseen that plaintiffs would buy carpeting, furniture and lamps solely for use on the leased premises. Had the lease term even approximated the normal life-span of such articles, our conclusion might be different, but we cannot conclude that a landlord would foresee that a prospective tenant would buy expensive articles solely for use in a house which was to be occupied for two years. This might be the case if there was an option to purchase or to renew the contract contained in the original lease, but this circumstance is not present. Further, the plaintiffs themselves testified that they had no intention of abandoning the articles purchased at the end of the lease term and that some, if not all of the things so purchased are presently being used by them. Under these circumstances it is apparent that not only were such purchases not within the reasonable foreseeable compass of the contract, it seems equally apparent that plaintiffs have suffered no pecuniary loss thereby. In

any event, we could not award plaintiffs the full amount of the purchase price since the articles have utility, have been in constant use and must have some present market value. No evidence has been produced with respect to such matters.

"Applying the rule of compensation above-mentioned to the claim for expenses of plaintiffs in going to New York to purchase the carpeting, we can see no legal basis for awarding damages for this item. The defendants could no more foresee that plaintiffs would go to New York to purchase furniture which is available in our local markets than they could foresee that the plaintiffs would go to Europe for the purpose of buying paintings by the old masters. Further, the evidence is not clear that these expenses were all incurred in acquiring the carpeting nor is the amount of expenditure made sufficiently certain for the Chancellor to make an intelligent appraisal of their extent.

"We are of opinion, however, that plaintiffs may recover for money spent in hiring draughtsmen and interior decorators. Defendants not only must have foreseen that the tenants would have to make measurements to determine the quantity of carpeting to buy, but they must also have foreseen that some professional advice would be secured in the matter of decorating the premises. In fact, defendants had ample notice, prior to the breach, that plaintiffs were about to incur such expenses. The plaintiffs having shown that they expended fifty dollars for the items mentioned, they are entitled to recover this amount.

"The last item of damage claimed is for the storage of plaintiffs' household furniture from the time of the breach to the time plaintiffs succeeded in building their own home and making provisions for removing such furniture from storage. At first blush this would appear to be a proper item of damage. Most surely, if

defendants by their breach extended the period required for the storage of plaintiffs' goods, it is the defendants who must bear whatever loss such breach incurred. The question is, how much of such storage are they required to pay? The total bill for storage for the period in question was $357.50, but certain factors must be borne in mind. Plaintiffs did not secure accommodations for the storage period in a home wherein they could use their own furniture. Instead they rented furnished apartments and allowed the furniture to remain in the warehouse. By-passing the question whether they had a duty to minimize their losses by making other arrangement and by-passing also the logical question whether storage would be foreseeable in a case involving a tenant who could secure other rental facilities, the point remains that all of the storage bill cannot be laid at defendants' doorstep. Had this contract been completed, plaintiffs would have been obligated to pay defendants the sum of $170.00 a month for the occupancy of the premises. This sum would, in part, cover the item of furniture placement. It would seem logical and just that defendants ought not to be required to pay more than plaintiffs' loss. Therefore, it would seem that the proper measure of damage in this respect would be the difference between the rent prescribed in the lease and the rent actually paid for the furnished apartment as compared with the monthly storage bill. Thus, for example, if the rent for the apartment were $100.00 a month, the difference between this obligation and the obligation incurred under the lease would be seventy dollars. If seventy dollars did not equal the monthly storage bill, defendants should be required to pay the difference. If it exceeded the monthly storage bill, plaintiffs suffered no pecuniary loss and defendants ought not to pay anything. The difficulty in this regard is that

there is absolutely no testimony from which such a computation could be made. The plaintiffs' case is silent as to the rent paid for the apartment. Returning now to the question of minimizing damages, there is no testimony that equal rental facilities were not available to plaintiffs during the period in question; in fact, the testimony discloses that there was at least one house offered to plaintiffs where they could live and use their furniture. We believe that before there can be recovery for storage the plaintiffs must show first that the storage was necessary, second the amount of their pecuniary loss as a result of such storage, and third, that they made efforts to secure desirable quarters of a similar character as the house in question and were unable to do so. It must be remembered that the plaintiffs did not put their furniture in storage as a result of this breach. Their furniture was already in storage at the time the contract was made and the only effect the breach had upon this item was the fact that the breach may have extended the period. Therefore, not because storage is not a recoverable item, but because the proofs did not rise high enough to support either the full amount of the storage bill or a reasonable computation of the actual loss, we must deny recovery for this item."

Decree affirmed at the cost of J. Robert Baldwin and Baldwin Brothers, Inc.