## GROVE PRESS INC.

v.

## CITY OF PHILADELPHIA, Appellant.

### No. 17956.

United States Court of Appeals
Third Circuit.

Argued Aug. 26, 1969.

Decided Nov. 3, 1969.

Levy Anderson, Thomas A. Matthews, Asst. City Solicitor, George J. Ivins, Deputy City Solicitor, Matthew W. Bullock, Jr., Second Deputy City Solicitor, Edward G. Bauer, Jr., City Solicitor, Philadelphia, Pa., for City of Philadelphia.

Aaron M. Fine, Dilworth, Paxson, Kalish, Kohn & Levy, Harold E. Kohn, Philadelphia, Pa., for appellee.

Before HASTIE, Chief Judge, BIGGS and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

On April 23, 1969, a Swedish motion picture titled "I Am Curious (Yellow)" opened for showing in the City of Philadelphia. That same day, the city solicitor filed an action in equity in the Court of Common Pleas of Philadelphia County seeking to enjoin exhibition of the film on the grounds that it was obscene and a public nuisance.[1] In this ex parte proceeding, a Rule to Show Cause why a preliminary injunction should not issue was returned against the theatre, the 19th and Chestnut Street Corporation, and the individual defendants, its owners.

In its complaint for injunctive relief the City made the following averments:

"Paragraph 9: The City has been informed, believes and therefore avers that the dominating theme of the said moving picture film is designed to appeal to a prurient interest in sex; is patently offensive in that it affronts the contemporary community standards relating to the description or representation of sexual matters; and is a graphic portrayal of sexual intercourse between a male and female under varying circumstances including scenes of oral-genital activity.

"Paragraph 10: Plaintiff avers that the said film is obscene and pornographic * * *

"Paragraph 12: Plaintiff has been informed, believes and therefore avers that the said film is wholly devoid of any artistic values and is without any redeeming social or entertaining value but is displayed solely for a financial profit to be made at the expense of the public welfare and public morals of the community.

"Paragraph 13: Plaintiff further avers that the continued display of said moving picture film constitutes a public nuisance as well as a display of public obscenity and pornography."

The City's complaint was thus a blend of common law concepts of public nuisance and certain language found in Pennsylvania's criminal obscenity statute.[2] This duality was manifested in a colloquy between the court and counsel for the City:

"THE COURT: In other words, you are asserting a right to ban further showing of the film judicially on the ground that it was a nuisance?

MR. IVINS: That is right, Sir.

---

1. In a Tariff Act proceeding, 19 U.S.C.A. § 1305, the government sought to prohibit the film's importation on the ground that it was obscene. A jury found it to be obscene, United States v. A Motion Picture Film Entitled "I Am Curious—Yellow," 285 F.Supp. 465 (S.D.N.Y.1968). The United States Court of Appeals for the Second Circuit reversed, 404 F.2d 196 (2 Cir. 1968).

2. 18 P.S. § 4528 provides that it shall be a misdemeanor to exhibit a motion picture "of an obscene nature" and that "an exhibition shall be deemed obscene if, to the average person applying contemporary community standards, its dominant theme taken as a whole appeals to prurient interests."

THE COURT: Without reference to the obscenity statute?

MR. IVINS: The only time the obscenity statute can come into it is where someone wants to know what will make a matter obscene, what will make a matter a public nuisance. If indirectly it were decided that this film corrupts the morals, someone may say: on what basis are you alleging that?

It may well be I would have to bring in obscenity. But at this moment and in the present posture of this case we are proceeding on the ground that this is a public nuisance."

Before the return date of the rule, however, the defendant exhibitors removed the action to the United States District Court for the Eastern District of Pennsylvania, citing as justification for the removal the original jurisdiction of the federal courts over matters involving a federal question arising under the Constitution of the United States. The City presented an opposing motion to remand the action to the state court.

Thereafter, on May 1, 1969, with the removed action still pending in the district court, a separate suit was filed before the federal forum by Grove Press, Inc., a New York corporation and distributor of the Swedish film in the United States. Grove was not a party to the prior action commenced by the City in the state court. In its suit Grove alleged diversity of citizenship, the existence of a federal constitutional question and violations of federal Civil Rights legislation as the basis for the district court's jurisdiction. Grove sought to enjoin the City from interfering with the exhibition of the film and requested a declaratory judgment that the movie was not obscene under federal constitutional standards.

The district court granted Grove's prayer for an injunction and restrained the City from proceeding in the state courts on a theory of public nuisance. The court found the City's actions "re-pugnant to the Due Process Clause of the Fourteenth Amendment," because the concept of public nuisance was too broad and too vague a test to proscribe activities as beyond First Amendment protection. Citing the doctrine of Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), the court also viewed the Pennsylvania procedures in equity as "an additional threat to the freedom of expression," because they failed to guarantee prompt final judicial determination of the First Amendment issue which was the subject of preliminary restraint.

In granting the injunction the court was careful to point out that it was not finding the film constitutionally protected, but only that the City could not attempt to prohibit its exhibition under the theory of a common law nuisance.

The court made a specific finding that its action was "not based on a conclusion that the City proceeded against the film in bad faith." Indeed, the court concluded that the question of the film's nonobscenity was not so clear that the mere institution of a proceeding to enjoin it under a properly drawn obscenity statute would be violative of federal constitutional rights. 300 F.Supp. 281, 287.

I.

Preliminarily, it is important to note what is not before us in this appeal. Although the court below did issue the injunction requested by Grove, it refused the prayer for declaratory judgment on the issue of the film's obscenity. There was no appeal taken from this denial. Accordingly, declaratory judgment considerations are not before us. Additionally, because the film is no longer being shown by the defendant-exhibitors at the 19th & Chestnut Street Theatre, the appeal in the remand case has been dismissed on the ground of mootness.[3] This latter disposition does not affect the present appeal since public advertisements reveal that the film is now being

3. City of Philadelphia v. 19th and Chestnut Street Corp., et al., No. 17955.

shown in four locations in rerun movie houses in the City of Philadelphia.

We therefore move to consider whether the district court acted correctly in enjoining Philadelphia from further interference with the showing of the film. In so doing, a threshold question of fundamental importance must command our attention: When may a federal court intervene in proceedings before a state forum?

■ Because the power and jurisdiction of the lower federal courts are subject to Congressional supervision, we begin with an analysis of the relevant legislation. 28 U.S.C.A. § 2283 provides:

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

Thus it is evident that the maintenance of a delicate balance between federal and state judicial functions is a Congressional mandate which, under ordinary circumstances, prohibits a federal court from enjoining state proceedings.

This court has previously held, however, that the Civil Rights Act of 1871, 42 U.S.C.A. § 1983, invoked by Grove, creates an express statutory exception to the general prohibition of Section 2283. Cooper v. Hutchinson, 184 F.2d 119 (3 Cir. 1950).[4] It is questionable, however, that federal intervention in this case should lean on so slender a reed. We are not at all certain that an appropriate case of deprivation of civil rights was properly pleaded. In the absence of an averment alleging state court procedural deficiencies interfering with those rights, Grove seems to be arguing that it is a deprivation of one's civil rights to have a state court consider that state's law of common law public nuisance and its laws of obscenity. Although we know of no interpretation of § 1983 by any court which has given such breadth to the statute, yet, we do not deem it necessary to reach this question, for we prefer to focus our attention on those judicially recognized exceptions to the general prohibition against federal intervention.

The basic rule is expressed in Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943) which, consonant with the letter of 28 U.S.C.A. § 2283, discourages federal interference with a state's good faith administration of its civil and criminal proceedings. This is based on the assumption that the state courts will observe constitutional limitations, and "the mere possibility of erroneous initial application of constitutional standards will usually not amount to the irreparable injury necessary to justify a disruption of orderly state proceedings." Dombrowski v. Pfister, 380 U.S. 479, 484–485, 85 S.Ct. 1116, 1120 (1965).

Even so, the Supreme Court has recognized that federal intervention is proper under special circumstances where the utilization of state procedures may itself chill the very constitutional right sought to be protected. Thus in *Dombrowski* the harassment caused by bad faith enforcement of a valid state law by state officers for the purpose of abridging free expression was deemed sufficient to merit federal interference. And in Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), abstention was held to be inappropriate because a New York statute was on its face an unconstitutional abridgment of protected expression. Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335 (1968), reiterated the continuing vitality of *Douglas* in the absence of these carved out exceptions.

4. Accord: Landry v. Daley, 288 F.Supp. 200 (N.D.Ill.1968). The Supreme Court has not passed on this question and has expressly kept it open. Cameron v. Johnson, 390 U.S. 611, 613, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); Dombrowski v. Pfister, 380 U.S. 479, 484, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). Other courts have held that § 1983 is not an exception to § 2283: Baines v. City of Danville, 337 F.2d 579 (4 Cir. 1964); Goss v. Illinois, 312 F.2d 257 (7 Cir. 1963); Sexton v. Barry, 233 F.2d 220 (6 Cir. 1956).

It is within this framework that we turn to a consideration of whether abstention was indicated in this case.

## II.

Implicit in the decision of the district court was its characterization of the City's position as resting on a particular concept of common law nuisance—a concept, repeatedly asserted at trial, urging that the showing of the film was a public nuisance per se—something which defined the harm, injury and prejudice to the public, while serving as the device to abate it. The City steadfastly emphasized this particular view. For example, its solicitor declared: "I am proceeding on public nuisance. If in public nuisance I have to define obscenity, I will use the definition in the statute. That is what I have said to the Court many times."

The subject did in fact come up "many times," and it is obvious why the court expressed continued concern about this particular theory. Without the City's specific stipulation that it was proceeding on public nuisance per se, the City's complaint in the state court was susceptible of an interpretation that the repeated showing of the film constituted a series of individual violations of Pennsylvania's criminal obscenity statutes, the continuing course of which amounted to a public nuisance which was abatable in equity.[5]

The advancement of such an interpretation would have required consideration of the myriad problems associated with federal intervention in the operation of a state statute, and if threshold determinations dictated intervention, the convocation of a three-judge court to consider the constitutionality of the statute would have been required. But at trial, the City meticulously rejected sponsorship of this theory. On appeal, as we shall later observe, the City has reversed its position absolutely and completely, and now urges the restraining-criminal-act view as its appropriate and legitimate passport into state injunctive procedures.

It has been stated by the Pennsylvania Supreme Court that "[i]njury to the public is the essence of a public nuisance," Pennsylvania S.P.C.A. v. Bravo Enterprises, *supra*, and that " 'a fair test as to whether a business is lawful in itself, or a particular use of property, constitutes a nuisance, is the reasonableness or unreasonableness of * * * the business or * * * use,' " Reid v. Brodsky, 397 Pa. 463, 156 A.2d 334, 338 (1959), quoting Hannum v. Gruber, 346 Pa. 417, 31 A.2d 99, 102 (1943). Moreover, " '[w]hether the use is reasonable generally depends upon many and varied facts. No hard and fast rule controls the subject. A use that would be reasonable under one set of facts might be unreasonable under another.' " *Id.*

We must consider the concept of common law nuisance in the context in which it was employed by the City in the district court: that the mere showing of the film was such a particular use of expression that it constituted a public nuisance per se, i. e., an unreasonable use of expression. Any evaluation of this concept must be made against the backdrop of those expressions protected by the First Amendment and those standards which outline the perimeter of proper governmental regulation.

The Supreme Court has made it abundantly clear that " 'a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.' " Zwickler v. Koota, 389 U.S. 241, 250, 88 S.Ct. 391, 396 (1967), quoting NAACP v. Alabama, 377 U.S. 388, 307, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964). Neither may the standard of regulation be so vague and indefinite "that men of common intelligence must necessarily guess at its meaning * * * [or] application." Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

5. Penna. S.P.C.A. v. Bravo Enterprises, Inc., 428 Pa. 350, 237 A.2d 342 (1968).

■ We have concluded that as a standard for regulating First Amendment rights, neither "injury to the public," nor "unreasonableness," standing alone, is sufficiently narrow or precise to pass constitutional muster. Each is too elastic and amorphous a standard by which to restrain the exercise of free expression. What is encountered with the sprawling doctrine of public nuisance is an attempt to restrict First Amendment rights by means analogous to those under "a statute sweeping in a great variety of conduct under a general and indefinite characterization, and leaving to the executive and judicial branches too wide a discretion in its application." Cantwell v. Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213 (1940).

■ The common law of public nuisance may be a perfectly valid method by which to implement a state's police power in certain defined circumstances where, for example, it is used to restrain that which is prohibited by other constitutionally appropriate standards. It may not be used, however, both to define the standards of protected speech and to serve as the vehicle for its restraint.

Accordingly, we agree with the conclusion reached by the district court as to the invalidity of utilizing a theory of public nuisance alone to enjoin expression. But the City has now abandoned this precise theory. From its original stance at trial it has now moved to a position of arguing before this court that because the film can be declared obscene under the criminal statute of the Commonwealth of Pennsylvania, state courts of equity have jurisdiction to enjoin its

continuing exhibition. We are mindful that the City has, in the words of Justice Jackson, "changed positions as nimbly as if dancing a quadrille." [6]

Were this case to turn on the validity of this change of position, we would not indulge in the dance. However, after carefully reviewing the matter, we have chosen to accept the City's present position on appeal that the standard of obscenity set forth in the criminal statutes of the Commonwealth of Pennsylvania was per force incorporated into the City's theory of public nuisance. We have done so because we find that the procedures employed by the City in the state courts to effect its censorship of the film come within the "chilling effect" exceptions to the general rule of Douglas.

■■ To reach this conclusion it is not necessary to depend upon a finding of bad faith by the City to bring this case within the Dombrowski exception. We hasten to add that although the district court specifically declared its holding "not based on a conclusion that the City proceeded * * * in bad faith," 300 F.Supp. at 289, our own independent review of the record reveals the presence of factors sufficient to support a contrary conclusion. The City's insistence upon pursuing one theory at trial and its subsequent shift of position before this court do not recommend it as a paragon of candor. It might be suggested that the City deliberately avoided at trial a confrontation on the constitutionality vel non of the Pennsylvania obscenity statute which would have required both a three-judge court and an inquiry into the obscenity issue itself.[7] This, in turn,

---

6. Orloff v. Willoughby, 345 U.S. 83, 87, 73 S.Ct. 534, 97 L.Ed. 842 (1953).

7. Where a state statute is attacked as unconstitutional, such a case must be heard by a three-judge court pursuant to the provisions of Title I of 28 U.S.C.A. §§ 2281 and 2284, unless the constitutional issue is "plainly insubstantial." Ex Parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 78. L.Ed. 152 (1933); Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715, 82 S.Ct. 1294, 8 L.Ed. 2d 794 (1968).

We do not consider the language of this statute as presenting a constitutional issue " 'obviously without merit' or because 'its unsoundness that clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy.' " Blass v. Weigel, 85 F. Supp. 775, 779 (D.N.J.1949), citing California Water Service v. Redding, 304 U.S. 252, 255, 58 S.Ct. 865, 82 L.Ed. 1323 (1937). See also Bailey v. Patter-

would have brought into question any precedental effect of the Second Circuit's ruling in United States v. A Motion Picture Called I Am Curious—Yellow, *supra*. We do not deem it necessary, however, to bottom our decision on the issue of bad faith.

Rather, we find a justification for federal intervention because the state court procedures chosen by the City—specifically the device of the preliminary injunction—collide with the First Amendment rights of protected expression and, in our view, bring into play the type of "chilling effect" exception discussed in *Zwickler*.[8]

It has been said that prior restraint upon speech suppresses the precise freedom which the First Amendment sought to protect, Carroll v. President and Com'rs of Princess Anne, 393 U.S. 175, 181, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968) and that the elimination of prior restraints was a "leading purpose" in the adoption of the First Amendment. See Lovell v. Griffin, 303 U.S. 444, 451–452, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

Furthermore, a "system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity," Bantam Books v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963).

It is the teaching of Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 that to impose restraint on expression there must be firm guarantees of a judicial determination and that the "procedure must also assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous" preliminary restraint.

Pennsylvania equity actions under which the City's action was instituted are governed by the Rules of Civil Procedure promulgated by the state's Supreme Court. These rules provide that a preliminary injunction may issue with or without written notice and hearing, Pa.R. C.P. 1531(a), 12 P.S. Appendix; that when granted without notice shall be deemed dissolved unless a hearing on the continuance of the injunction is held within five (5) days, Pa.R.C.P. 1531(d);

son, 369 U.S. 31, 33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962), where it is suggested that there should be a denial of a three-judge court only where the claim is "wholly insubstantial, legally speaking nonexistent."

That the district court could be considered as being without authority to consider the constitutionality of the statute in the absence of a three-judge court, however, does not control our determination.

8. Unlike the situation in *Zwickler*, where the statute was constitutionally defective on its face, we do not suggest that the Pennsylvania obscenity statute falls into this category. The Superior Court of Pennsylvania has pointed out the similarity between the language of the statute and the standards set forth by the United States Supreme Court:

"In Jacobellis v. State of Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964), and in A Book Named 'John Cleland's Memoirs of a Woman of Pleasure' v. Attorney General, [383 U.S. 413,] 86 S.Ct. 975 [16 L.Ed.2d 1] (March 21, 1966), the Court reaffirmed the test for obscenity enunciated in Roth v. United States, supra, [354 U.S. 476,

77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)] : '[W]hether to the average persons, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.'

"Section 528 of the Penal Code provides:

'An exhibition shall be deemed obscene if, to the average person applying contemporary community standards, its dominant theme taken as a whole appeals to prurient interest.'

"It is evident that this definition of obscenity conforms with the standard set forth in *Roth, Jacobellis* and *Memoirs*, and that the Court below erred in holding § 528 to be unconstitutionally vague." Smith v. Crumlish, 207 Pa. Super. 516, 218 A.2d 596 (1966).

Accordingly, we agree with the district court's conclusion that the Pennsylvania obscenity statute "may be an appropriate state legislative attempt to define specifically those kinds of materials which may be prohibited as obscene and, as narrowed by state judicial construction, it may establish a constitutionally valid scheme for proceeding against those who allegedly distribute and/or sell obscene material." 300 F.Supp. at 287.

90

and that after a preliminary hearing, the court may dissolve, continue, or modify the injunction, Pa.R.C.P. 1531(e); 12 P.S. Appendix.

■ The purpose of a Pennsylvania preliminary injunction hearing is to receive prima facie evidence of facts to be ultimately established at the final hearing. " 'There are two kinds of injunctions in [Pennsylvania] courts of equity. The one is preliminary or interlocutory; the other final or perpetual. The object of the first in general is simply preventative—to maintain things in the condition in which they are at the time until the rights and equities of the parties can be considered and determined after a full examination and hearing.' " Emerman v. Baldwin, 186 Pa.Super. 561, 142 A.2d 440, 446 (1958), quoting Audenried v. Philadelphia & Reading R. R., 68 Pa. 370, 375.

The rules do not designate when the final hearing must be held subsequent to the granting of a preliminary injunction, although the general practice is to calendar equity actions on an accelerated trial list. Pa.R.C.P. 1517 as amended, September 1, 1969, provides that the adjudication "may be made orally in open court at the end of the trial or it may be made thereafter in writing." A note to this rule makes reference to Pennsylvania Supreme Court Rule 78 requiring a report to the Supreme Court of all matters undisposed of for sixty (60) days or more after having been submitted.[9]

■ The mischief we perceive in the Pennsylvania equity rules is that there is no guarantee a final hearing will be seasonably scheduled after the issuance of a preliminary injunction and that a prompt decision will be forthcoming thereafter. The preliminary restraint could exist days, and even months, before the judicial decision on the merits; where this possibility exists, an unacceptable threat to the freedom of expression without out due process of law results. Failure to provide the necessary expeditiousness tinges the Pennsylvania preliminary injunctive procedures with unconstitutional hues when they are employed to restrain or inhibit expression prior to a final adjudication of an alleged obscene matter.

■ We do not challenge, we reiterate, the postulate that "the primary requirements of decency may be enforced against obscene publications." Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957). This means that relief may be sought in both the civil and criminal branches of the Pennsylvania court system to enforce state laws on obscenity, consonant with the Due Process Clause of the Fourteenth Amendment and the guarantee of First Amendment expression. It is only when the right of the state to regulate obscenity collides with undue inhibition of protected expression that a problem of constitutional dimension arises. Where expression is inhibited as a result of prompt judicial decision reached after an adversary proceeding, there can be no procedural due process complaint. But where the inhibition occurs in a preliminary proceeding, with no guarantee of a prompt judicial decision on the merits, the procedure is constitutionally defective because a restraint of presumably protected expression not only occurs but is capable of persisting for an unlimited time prior to the required judicial determination.

Our conclusion is not novel in Pennsylvania jurisprudence. The same basic determination has already been alluded to by Mr. Justice O'Brien, speaking for an evenly divided state Supreme Court in Commonwealth v. Guild Theatre, Inc., 432 Pa. 378, 248 A.2d 45 (1968), where the validity of employing the Pennsylvania equity rules to enjoin obscene exhibitions was also raised. There, the state author-

9. Special Rule VIII of the Court of Common Pleas of the First Judicial District (Pennsylvania), Philadelphia County, adopted July 31, 1963, had provided for a decision by the chancellor within seventy-two (72) hours after final hearing. This rule has now been superseded by the September 1, 1969 amendment to Rule 1517.

ities had secured an ex parte injunction without affording the exhibitors any opportunity to be heard. In ruling such procedures constitutionally defective, Mr. Justice O'Brien observed:

"However, even if a proper hearing had been held, the instant proceeding was fatally defective in another respect. * * * Although we cannot agree with appellants' contention that no prior restraint on the exhibition of a motion picture is permissible, it is clear that any such restraint must be carefuly circumscribed. In Freedman v. State of Maryland, 380 U.S. 51, 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965) the Supreme Court discussed the 'procedural safeguards designed to obviate the dangers of a censorship system.' One of these safeguards was a prompt, final judicial decision. * * The fact that appellants may have been offered a full dress *hearing* within four days of the original restraint does not suffice. Quite clearly, there is no provision for a prompt *decision*. It is vital that the continuance of First Amendment freedoms not be dependent upon the efficiency of a particular judge but upon procedural safeguards clearly embodied in a statute. We can only suggest, as did the Court in *Freedman*, supra, that a model for such a statute which can safeguard both the First Amendment freedoms of exhibitors and publishers, and the freedom from obscenity of society as a whole can be found in Kinglsey Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957). The New York statute there provided for a trial within one day after joinder of issue and a decision within two days of the conclusion of the trial. The instant procedure falls far short of that required." 248 A.2d at 47–48.

Our finding of constitutional deficiency in the Pennsylvania procedural schema controls our determination in two important respects. Because the Pennsylvania preliminary injunctive process "fails to provide adequate safeguards against undue inhibition of protected expression,"

*Freedman, supra,* it presents "special circumstances" within the "chilling effects" exception of *Zwickler*. It was therefore proper for the district court to refuse to abstain from considering the case on its merits.

Additionally, the same determination of constitutional deficiency decides the issue on the merits; this finding is ample justification for the district court to have enjoined the City from proceeding for a preliminary injunction in the state court to restrain the exhibition of the film.

We will affirm the judgment of the district court. Consistent with the views expressed herein, however, the case will be remanded for the limited purpose of having the district court order modified to reflect our precise holding. The modified order shall enjoin the City from:

(1.) Seeking to restrain the exhibition of the film by a preliminary injunction proceeding prior to a final adjudication.

(2.) Seeking to restrain the exhibition of the film in any civil proceeding on the theory that the common law doctrine of public nuisance is capable of defining the limits of prohibited expression.