**Robert D. SCHULMAN
t/a Maxi's Express,**

v.

**J.P. MORGAN INVESTMENT MANAGEMENT, INC. and Widener
Funding Corp., Inc.**

Civ. A. No. 92–2853.

United States District Court,
E.D. Pennsylvania.

Aug. 10, 1993.

Daniel J. Dugan, Philadelphia, PA, for plaintiff.

Leonard S. Baum, New York City, M. Melvin Shralow, Philadelphia, PA, for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

In this case, plaintiff contends that the lenders who financed the renovation of an office building tortiously interfered with his existing and prospective contractual relations with the building's owners. Defendants, the lenders, move for summary judgment on plaintiff's claims and for the imposition of sanctions. They also move for summary judgment on their counterclaim seeking declaratory judgment that plaintiff has no lease for space in the building.

For the reasons stated below, I will grant defendants' motions for summary judgment and declaratory judgment but refuse their motion for sanctions.

I. *Stipulated Facts*

Pursuant to a court order, the parties submitted a set of stipulated facts. (*See* Baum Aff. ¶¶ 3–42.) The pertinent ones are as follows.

The plaintiff, Robert D. Schulman, is a chef and former manager of several prominent Philadelphia restaurants. In 1990, he was approached by Jeffrey Kelter, a general partner of Widener Associates Limited Partnership ("WALP"), about opening a food service operation on the ground floor of the Widener Building. The Widener Building is a commercial office building on South Penn Square, Philadelphia, Pennsylvania. The opening of the new store was to be part of

WALP's $63 million renovation of the building.

Schulman was interested. He and Kelter began planning "Maxi's Express," a 1,400 square-foot store offering coffee, muffins, sandwiches, beverages, cards, and other items. Kelter sent Schulman four successive draft leases for this space, dated June 4, 1990, March 19, 1991, August 6, 1991, and January 31, 1992. Although no lease had been executed, Maxi's construction began and Schulman opened the store in December, 1991, in time for the building's grand re-opening celebration.

Almost immediately thereafter, Kelter began telling Schulman he was dissatisfied with the store's appearance and operations. Specifically, Kelter objected to Maxi's second-hand equipment, food smells, dirty floors, and other features which Kelter said made Maxi's more of a "drawback" to the building "than an amenity." Other tenants of the building and its broker evidently also complained to Kelter about Maxi's.

Over the next three months, Schulman and Kelter talked about improving Maxi's, but reached no successful resolution. In March of 1992, Kelter instead told Schulman that there would be no lease, that Schulman's prior rent checks and out-of-pocket expenses would be returned, and that Schulman should vacate the premises immediately. When Schulman refused, Kelter initiated an ejectment action on behalf of WALP in the Philadelphia Court of Common Pleas.[1]

It was evidence in a preliminary injunction hearing in that action which has given rise to this suit. In April, 1992, Schulman heard the testimony of Anne Pfeiffer, a vice-president of J.P. Morgan Investment Management, Inc. in charge of the $63 million loan to WALP. J.P. Morgan manages an open-end real estate fund which served as the lender. (The loan itself was made through a feeder company, wholly-owned by Morgan, called the Widener Funding Corporation ("WFC"). WFC is the other defendant in this suit.) Pfeiffer testified that after seeing Maxi's in operation the morning after the grand opening, she told Kelter the store "represented [her] worst nightmare."

Based on this testimony, Schulman sued WFC and Morgan for intentional interference with actual and prospective contractual relations. He claims that: 1) he and Kelter had agreed on "all the significant terms" of the purported lease by August, 1991; 2) the lease came into existence when construction began on Maxi's in the fall of 1991; and 3) the terms of the lease are set forth in the draft dated January 31, 1992.

## II. Defendants' Motion for Summary Judgment

### A. Intentional Interference with Contractual Relations

■ As a matter of law, Schulman had no existing contract with WALP, and his first intentional interference claim must therefore fail.[2]

#### 1. No Executed Lease

First, there was no contractual relationship between WALP and Schulman because WALP never executed a lease for Schulman's space. The draft lease dated January 31, 1992, which Schulman claims sets forth the terms of his lease, expressly bars the agreement from taking effect until both the landlord and tenant have signed and delivered it. Paragraph 57 states:

57. *DELIVERY FOR EXAMINATION.* DELIVERY OF THE LEASE TO TENANT SHALL NOT BIND LANDLORD IN ANY MANNER, AND NO LEASE OR OBLIGATION SHALL ARISE UNTIL THIS INSTRUMENT IS SIGNED BY BOTH LANDLORD AND TENANT AND DELIVERY IS MADE TO EACH.

1. This action is now pending as *Jeffrey Kelter, et al., t/a Widener Associates Limited Partnership v. Robert D. Schulman*, March Term, 1992, No. 4547.

2. The elements of intentional interference with existing contractual relations are: (1) the existence of a contractual relationship; (2) an intent on the part of the defendants to harm the plaintiff by interfering with those contractual relations; (3) absence of privilege or justification for the interference; and (4) damages. *See Neish v. Beaver Newspapers*, 398 Pa.Super. 588, 581 A.2d 619, 625 (1990).

Schulman does not contend WALP signed this or any of the other three draft leases. Moreover, neither Schulman nor his reviewing counsel ever objected to this clause in any of the drafts (an objection which might have removed that clause from an otherwise enforceable agreement). The lease could not have taken effect.

### 2. No Combination of Writings in Place of Lease

■ Second, there was no writing or combination of writings that took the place of a lease. Despite Schulman's argument to the contrary, references by Kelter's employees to the January 31, 1992, draft as a "lease" did not transform it into one. On February 3, 1992, Stephen Butte, who worked for Kelter, sent Schulman confirmation of his rent "pursuant to the terms of your lease." The next day, another employee, Jennifer Pancoast, forwarded to Schulman three "approved execution copies" of the draft for his signature.

While Schulman did pay rent to WALP, and Ms. Pancoast did have draft leases *prepared* for execution, neither of those employees' writings operated to create a lease where WALP never signed the *agreement*, as required. The employees' remarks, though perhaps inappropriately worded, could not, either by themselves or in combination with the January 31, 1992, draft, give rise to an enforceable lease.

### 3. No Oral Agreement Sufficient to Create Lease

■ Next, Schulman contends the signature and delivery provisions of paragraph 57 can be bypassed as a matter of equity, since he and Kelter had orally agreed on all the significant terms of his lease earlier in 1991. The executed writing, he contends, was only to formalize the lease agreement they had entered into in the fall when Maxi's construction began. For support, Schulman cites

3. WALP's original primary lender was the Equitable Life Assurance Society of the United States, but in July, 1991, Equitable assigned all of its interests to WFC.

4. The only exception to both sections 6.01.01 and 10.01 is that leases may be granted without the lender's approval if done "in strict accordance with the provisions of the Loan Agreement."

*Emerman v. Baldwin,* 186 Pa.Super. 561, 142 A.2d 440 (1958). *Emerman* held that a lease agreement may arise without a writing:

The minds of the parties having met and reached an accord as to the essential provisions of the contract, such writing would simply exhibit just what they agreed upon and understood. Although a formal contract is to be thereafter executed, if the terms have been agreed upon, legal obligations may arise.

*Id.* 142 A.2d at 444 (citations omitted). However, the sentence before the one just quoted (which Schulman does not cite), states: "where all the terms of contract are agreed upon and its reduction to writing is provided for, merely for proof as to its terms, such provision for a written contract is not inconsistent with a present contract." *Id.*

Here, however, paragraph 57 makes clear that an executed writing was *not* provided "merely for proof as to [the contract's] terms," but rather, as a necessary precondition to any obligation on the part of either Schulman or WALP. Signature and delivery were required. No contract was created by the conversations between Schulman and Kelter.

### 4. No Authority to Enter Lease

■ Finally, there was no lease between Schulman and WALP because WALP lacked authority to rent out space without WFC's prior written approval. This is evident from the loan documents executed and promptly recorded by WALP and WFC.[3] Section 6.01.1 of the mortgage, for example, forbids WALP from executing leases without the mortgagee's written consent. Section 9.01(k) makes WALP's sale, conveyance, encumbrance, or other transfer of control without the mortgagee's prior written consent an "event of default," and section 10.01 again forbids transfers of any kind without the mortgagee's prior written consent.[4]

The loan agreement exempts only those leases which "prior to the Closing, ... demise[ ] less than 5,000 square feet of Rentable Area and which otherwise compl[y]" with the other agreement provisions.

Although Schulman's space occupies only 1,407 square feet, even he does not contend his lease took effect "prior to the Closing," which occurred on June 8, 1990.

WALP also covenanted in section 4(k) of the assignment of leases that it would:

> Not lease any part of the Property, or renew or extend the term of any Lease of any part of the Property without, in each case, the prior written consent of the Assignee or as expressly provided for in the Loan Agreement.[5]

Schulman argues that as a prospective tenant, he cannot have been expected to rummage through volumes of loan documents between WALP and WFC to see if WALP was restricted in its ability to lease space. This argument is unpersuasive. First, as defendants point out, it has been recognized in Pennsylvania for approximately 100 years that the recording of a mortgage from that day forward is "notice to all the world of its existence and contents." *Horner v. Warfield, et al.*, 180 Pa. 103, 36 A. 418 (1987). More significantly, it is not *relevant* for purposes of this suit whether Schulman knew or even should have known about WFC's approval rights.[6] All that matters is whether Schulman *had* an enforceable contract with WALP so that WFC and J.P. Morgan might have intentionally interfered with it. Since no lease could take effect until WALP had signed it, and no signature could be forthcoming without WFC's approval—and there is no allegation that WFC was ever even solicited for let alone granted its approval—there was no lease.[7] Schulman's intentional interference claim must fail.

### B. Intentional Interference with Prospective Contractual Relations

■ Schulman's alternative claim for intentional interference with prospective contractual relations must also fail, for three reasons. The elements of this tort are: 1) a prospective contractual relation; 2) intent to harm the plaintiff by preventing the relation from occurring; 3) absence of privilege or justification on the defendant's part; and 4) resulting damage. *See Silver v. Mendel*, 894 F.2d 598, 601–02 (3d Cir.), (citing *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 471 (1979)), *cert. denied*, 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990).

### 1. No Prospective Contractual Relation

■ First, to be "prospective," a contractual relation must have objectively appeared to be reasonably probable. *See Thompson Coal*, 412 A.2d at 471. *Nothing* in the entire record suggests that WFC would have granted the necessary approval. The night Maxi's opened, Anne Pfeiffer called it her "worst nightmare." Schulman nowhere suggests that Pfeiffer or anyone else who could speak for WFC ever changed that opinion. Moreover, Schulman presents no evidence to rebut defendants' confident contention that Pfeiffer would *not* have approved Schulman's tenancy, and mere speculation that she may have done so cannot defeat a motion for summary judgment. *See Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 383 n. 12 (3d Cir.1990) ("an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment").

### 2. WFC's Right of Veto over WALP's Choice of Tenants

■ Second, pursuant to the loan documents earlier discussed, WFC had reserved the right to approve (or veto) WALP's choice of tenants for the Widener Building. WFC's reservation of rights defeats Schulman's claim of intentional interference with prospective contractual relations. A lender who retains veto power over a landlord's choice of tenant cannot be said to tortiously interfere with a "prospective" lease just because it exercises its veto. This is so *at least* absent

---

**5.** *See* n. 4, *supra*.

**6.** Defendants cite parts of Schulman's testimony which indicate that he knew that WFC (and Pfeiffer in particular) had to approve his lease.

**7.** Schulman also argues that WFC did *not* have approval rights because a mortgage "does not

and cannot prevent a valid and enforceable lease from taking effect." (Plf.'s Mem. in Opp. to Dfts.' Mot. for Sum. Judg. and Sanctions at 12.) Schulman's argument is circular, however: he did not have a "valid and enforceable lease" because, pursuant to that mortgage, a lease needed WFC's prior approval.

allegations of bad faith.[8] WFC acted pursuant to its own reserved, contractual right to oversee the selection of Widener Building tenants, and therefore cannot be said to have improperly interfered. *See* Restatement (Second) of Torts § 773.[9]

### 3. *Pfeiffer's Interference was Privileged*

Finally, *even* if Schulman could have obtained a lease without WFC's approval, or even if his lease could be called prospective, defendants are entitled to summary judgment because Pfeiffer's alleged "interference" was privileged.

■ Privilege to interfere with another's prospective relations arises from one's interest in protecting one's own legitimate concerns. *See Advent Systems Ltd. v. Unisys Corp.*, 925 F.2d 670, 673 (3d Cir.1991) (a parent corporation is privileged to disrupt its subsidiary's prospective contractual relations in the interest of its own economic concerns); *Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895, 899 (1971). "Privilege is closely related to intent, and admits of no precise definition. When a defendant acts at least in part to protect some legitimate concern that conflicts with [his or her own] interest, ... the central inquiry ... is whether the interference is 'sanctioned' by the ' "rules of the game" ... [and] regard[ed] as privileged.' " *Advent Systems*, 925 F.2d at 673 (citations omitted).

Section 769 of the Restatement (Second) of Torts is particularly helpful here. Whereas section 773 guards interference by those protecting legal interests, section 769 protects intentional interference committed by one with a *financial* interest in another's business. Section 769 states:

> One who, having a financial interest in the business of a third person, intentionally causes that person not to enter into a prospective contractual relation with another, does not interfere improperly with the other's relation if he
>
> (a) does not employ wrongful means and
>
> (b) acts to protect his interest from being prejudiced by the relation.[10]

Illustration 1 to the section is nearly our case:

> A provides the financial backing for B's theatrical production. The arrangement is in the form of a loan for the purposes of the production. While B undertakes to repay the loan in any event, in fact the chances of repayment depend upon the success of the play. B is about to engage C to play the leading role. Under the conditions stated in Clauses (a) and (b), A's interference with the prospective relation by causing B not to have C play that role is not improper.

The defendants' interference with WALP's "prospective" relation with Schulman here is similarly privileged. WFC's financial interest in the Widener Building fully justifies its privilege to veto WALP's choice of tenants—which, indeed, WALP acknowledged by

---

**8.** *But see Cloverleaf Development v. Horizon Financial*, 347 Pa.Super. 75, 500 A.2d 163, 168 (1985) (holding that *even* where bad faith is alleged, a defendant's interference is not actionable if the interferer acted pursuant to his contractual rights).

**9.** That section states:
> One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

This section has been adopted by the Pennsylvania Superior Court, *see Kelly–Springfield Tire Co.*

*v. D'Ambro*, 408 Pa.Super. 301, 596 A.2d 867, 872 (1991), and cited approvingly by this court. *See Geofreeze Corp. v. Hannah Const. Co.*, 588 F.Supp. 1341, 1345–46 (E.D.Pa.1984).

**10.** This section has been cited approvingly by the Pennsylvania Superior Court, *see Yaindl v. Ingersoll–Rand Co.*, 281 Pa.Super. 560, 422 A.2d 611, 625 (1980), and this court. *See, e.g., Wagner v. Continental Bank*, No. 89–1878, 1991 WL 68024, at *7–8 (E.D.Pa., April 25, 1991) (holding parent corporation's interference with subsidiary's prospective relation was "proper"); *Mercier v. ICH Corp.*, No. 87–3855, 1990 WL 107325, at *5 (E.D.Pa. July 25, 1990) (same); *Electronic Laboratory Supply Co. v. Motorola, Inc.*, No. 88–4494, 1989 WL 113127, at *9 (E.D.Pa. Sept. 20, 1989); *Ferreri v. Goldberg Securities*, No. 88–4041, 1989 WL 11073, at *4–5 (E.D.Pa. Feb. 7, 1989).

granting that right contractually at the time of the loan. Pfeiffer's interference was privileged.

### III. *Declaratory Judgment*

Because it is clear that Schulman had no binding lease with WALP, I must also grant defendants' motion for summary judgment on their declaratory judgment counterclaim. I reiterate what I said when I permitted the addition of the counterclaim: my declaration may not resolve the question still pending (as far as I know) in state court regarding what rights Schulman has against a landlord who allegedly represents it can freely enter into a lease, when in fact it cannot. Nonetheless, declaratory judgment in this suit is appropriate.

### IV. *Sanctions*

I am not persuaded that Schulman's arguments are frivolous enough to merit sanctions under Federal Rule of Civil Procedure 11.

An order follows.

### ORDER

AND NOW, this 10th day of August, 1993, it is hereby ordered that:

1. The defendants' motion for summary judgment on plaintiff's claims for intentional interference with contractual relations and intentional interference with prospective contractual relations is granted.

2. Judgment is entered for defendants and against plaintiff on those claims.

3. The defendants' motion for summary judgment on the counterclaim is granted, and it is declared that plaintiff has no legally enforceable lease to any space at the Widener Building.

4. The defendants' motion for sanctions is denied.